UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

In the Matter of

SYNERGY BRANDS, INC.,

Debtor.

------------------------------------------------------------------X

KENNETH KIRSCHENBAUM, as Chapter 7
Trustee for the Estate of Synergy Brands, Inc.,

Plaintiff,

-against-

THOMAS BARBELLA, MAIR FAIBISH,
MITCHELL GERSTEIN, DAVID SHARIN,
THE CHARLES SCHWAB CORPORATION,
JP MORGAN CHASE & CO., JANNEY
MONTGOMERY SCOTT LLC and VANGUARD
FIDUCIARY TRUST COMPANY,

Defendants.

------------------------------------------------------------------X

Chapter 7
Case No. 11-70412-dte

AFFIDAVIT OF SERVICE

Adv. Pro. No. 11-8908-dte

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NASSAU   )

       EILEEN WAGDA, being duly sworn, deposes and says:

       I am not a party to the action, am over 18 years of age and reside at Levittown, New York.

       On April 20, 2011, I served a true copy of the annexed **ORDER SCHEDULING EXPEDITED HEARING ON TRUSTEE'S APPLICATION FOR PRELIMINARY INJUNCTION, SUPPORTING AFFIDAVIT, EXHIBITS, UNDERLYING COMPLAINT and MEMORANDUM OF LAW** in the following manner:

       BY: **OVERNIGHT MAIL** by placing the same in a sealed envelope in an official depository of Fedex within the State of New York, addressed to the last known address of the addressee(s) listed below:

Thomas Barbella
20 Cherry Lane
Syosset, New York 11791

Mair Faibish
14 Sabrina Court
Dix Hills, New York 11746

Mitchell Gerstein
114 Hidden Ponds Circle
Smithtown, New York 11787

David Sharin
1754 Park Street
Atlantic Beach, New York 11509

The Charles Schwab Corporation
211 Main Street
San Francisco, CA 94105
Attention: Carrie E. Dwyer, General Counsel

JP Morgan Chase & Co.
National Subpoena Processing
7610 W. Washington Street
IN1-4054
Indianapolis, IN 46231-1335
Attention: Dennis Howard, Unit Lead

Janney Montgomery Scott, LLC
1801 Market Street - 8th Floor
Philadelphia, PA 19103
Attention: Carrie Chelko, Esq. - General Counsel
          Legal Dept.

Vanguard Fiduciary Trust Company
400 Devon Park Drive
Wayne, PA 19087-1815
Attention: Heidi Stam, Esq. - General Counsel
          Legal Dept. - V-26

Pryor & Mandelup
675 Old Country Road
Westbury, NY 11590
Attention: J. Logan Rappaport, Esq.

United States Trustee
Long Island Federal Courthouse
560 Federal Plaza
Central Islip, New York 11722

and by the following additional service:

**E-mail notification to the following parties at the following e-mail addresses:**

The Charles Schwab Corporation
e-mail: jane.jackson@schwab.com; carrie.dwyer@schwab.com

Vanguard Fiduciary Trust Company
e-mail: online@vanguard.com

United States Trustee
e-mail: christine.h.black@usdoj.gov

Pryor & Mandelup
e-mail: lr@pryormandelup.com

**Facsimile transmission to the following parties at the following facsimile numbers:**

JP Morgan Chase & Co.
Fax: (317) 757-7393

Janney Montgomery Scott, LLC
Fax: (215) 665-0824

_____
EILEEN WAGDA

Sworn to before me this
21st day of April, 2011

_____
NOTARY PUBLIC

TAL HIRSHBERG
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02HI6212693
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES 10/19/2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In the Matter of

SYNERGY BRANDS, INC.,

Chapter 7
Case No. 11-70412-dte

Debtor.
-----------------------------------------------------------X
KENNETH KIRSCHENBAUM, as Chapter 7
Trustee for the Estate of Synergy Brands, Inc.,

Plaintiff,

-against-

Adv. Pro. No. 11-08908-dte

THOMAS BARBELLA, MAIR FAIBISH,
MITCHELL GERSTEIN, DAVID SHARIN,
THE CHARLES SCHWAB CORPORATION,
JPMORGAN CHASE & CO., JANNEY
MONTGOMERY SCOTT LLC, & VANGUARD
FIDUCIARY TRUST COMPANY,

Defendants.
-----------------------------------------------------------X

## ORDER SCHEDULING EXPEDITED HEARING ON
## TRUSTEE'S APPLICATION FOR PRELIMINARY INJUNCTION

The Court having reviewed the affidavit of Kenneth Kirschenbaum, as Chapter 7 trustee

(the "Trustee") for the Estate of Synergy Brands, Inc. (the "Debtor") in support of his application

for a Temporary Restraining Order and Preliminary Injunction *(the "Application")*, the

supporting exhibits, and the Trustee's underlying complaint, and the Court having found *an*

*expedited hearing is appropriate, it is hereby*

ORDERED, that a hearing will be held on the *28th* day of April, 2011, at 10:00 a.m., or as

soon thereafter as counsel can be heard, before the Honorable Dorothy T. Eisenberg, at the

United States Bankruptcy Court, Long Island Federal Courthouse, 290 Federal Plaza, Room 760,

Central Islip, New York 11722 to consider the Trustee's Application for a preliminary

injunction; and it is further

ORDERED, that notice of the hearing to consider the Trustee's application for a

preliminary injunction shall be deemed good and sufficient if a copy of this Order, the

underlying complaint, and the Trustee's *Application and the exhibits* are served by *overnight*

mail, *and* electronic mail or facsimile transmission, on or before the *20th* day of April, 2011 upon

every named Defendant *(and counsel, if known)*, the Debtor's attorney, and the United States

Trustee; and it is further

ORDERED, that an affidavit of service evidencing service in accordance with this Order

shall be filed by the Trustee on or before the *22nd* day of April, 2011; and it is further

ORDERED, that answering papers, if any, shall be served by regular mail, electronic

mail, or facsimile transmission upon Kirschenbaum & Kirschenbaum, P.C., attorneys for the

Trustee, 200 Garden City Plaza, Suite 500, Garden City, New York 11530, Attention: Steven B.

Sheinwald, Esq., and filed with the Court so as to actually be received by 5:00 p.m. on the *26th*

day of April, 2011.



**Dated: Central Islip, New York**
**April 20, 2011**

Dorothy Eisenberg

**Dorothy Eisenberg**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In the Matter of

SYNERGY BRANDS, INC.,

                          Debtor.
------------------------------------------------------------X
KENNETH KIRSCHENBAUM, as Chapter 7
Trustee for the Estate of Synergy Brands, Inc.,

                        Plaintiff,

            -against-

THOMAS BARBELLA, MAIR FAIBISH,
MITCHELL GERSTEIN, DAVID SHARIN,
THE CHARLES SCHWAB CORPORATION,
JPMORGAN CHASE & CO., JANNEY
MONTGOMERY SCOTT LLC, & VANGUARD
FIDUCIARY TRUST COMPANY,

                      Defendants.

------------------------------------------------------------X

Chapter 7
Case No. 11-70412-dte

Adv. Pro. No. 11-08908-dte

**AFFIDAVIT IN SUPPORT OF
TRUSTEE'S APPLICATION
FOR A TEMPORARY
RESTRAINING ORDER AND
A PRELIMINARY INJUNCTION
PURSUANT TO RULE 65 OF
THE FEDERAL RULES OF
CIVIL PROCEDURE**

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NASSAU  )

       KENNETH KIRSCHENBAUM, being duly sworn, deposes and says:

       1.     I am the duly appointed and acting bankruptcy trustee of Synergy Brands, Inc.

(the "Debtor"), and I am familiar with the facts and circumstances surrounding the

administration of the Debtor's employer-driven 401(k) retirement plan.  I submit this affidavit in

support of the my request, pursuant to Rule 65 of the Federal Rules of Civil Procedure, made

applicable through Rule 7065 of the Federal Rules of Bankruptcy Procedure, for a temporary

restraining order and preliminary injunction to enjoin the transfer of certain funds pending the

disposition of the underlying adversary proceeding so as to preserve the status quo pending a final determination of the underlying adversary proceeding.

2. On January 28, 2011, the Debtor filed a voluntary petition (the "Petition") for relief pursuant to Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). At the time of filing the Debtor was a publicly traded holding company that principally operated through wholly owned subsidiaries. On February 8, 2011 I was appointed Chapter 7 Successor Trustee (the "Trustee") for the Debtor's bankruptcy estate (the "Estate").

3. Ever since Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005, bankruptcy trustees have a duty to perform the obligations required of the administrator of any ERISA qualified employee benefit plan pursuant to 11 U.S.C. § 704(a)(11). To that end, upon my preliminary investigation of the Debtor, I discovered that the Debtor had an ERISA qualified employee benefit plan entitled the Synergy Brands Inc. 401(k) Profit Sharing Plan (the "Plan"). A copy of the Plan is annexed hereto as Exhibit A. As such, pursuant to Congressional mandate, I have the duty to administer and terminate the Plan for the benefit of the Plan participants. To this end, there are, and will continue to be, costs and expenses associated with the termination of the Plan that should be shared by all Plan participants on a pro rata basis.

4. During the course of my investigation, I discovered that a select few Plan participants who constituted the executive leadership of the Debtor pre-petition, including Thomas Barbella, Mair Faibish, Mitchell Gerstein, and David Sharin (the "Insiders"), withdrew all their retirement plan funds (the "Funds") from the Plan Trust after the Debtor filed its bankruptcy petition. Specifically, each one of the Insiders rolled over funds being held for their benefit in the Plan Trust Fund to retirement accounts each one had individually established at

2

other financial institutions independently selected by them.  Such withdrawals aggregated to the

sum of $396,377.37.  Specifically, Mitchell Gerstein rolled over the sum of $86,460.91, Thomas

Barbella rolled over the sum of $99,420.35, David Sharin rolled over the sum of $128,415.44,

and Mair Faibish rolled over the sum of $82,080.66.  Copies of the issued checks showing the

rollover of funds from the Plan Trust Fund to the individual financial institutions for the benefit

of the Insiders are collectively annexed hereto as Exhibit B.  Even though the Plan agreement

provides that the plan administrator is to provide written authorization before any distribution is

made, I never gave any such authorization for such distributions nor did I designate any third

party to authorize such distributions.  During December 2010, which was one month prior to the

filing of the Petition, the Plan Trust Fund had an aggregate portfolio value of $744,888.80.  As of

March 14, 2011, the aggregate value of the Plan Trust Fund had decreased to the sum of

$247,902.49, largely as a result of the withdrawals by the Insiders.

    5.  According to Section 2.4 of the Plan Trust Agreement, the Plan Trustee shall pay

benefits, fees, and/or dividends paid on Employer Securities, if any, from the Trust Fund only

upon receipt of written direction from the Plan Administrator or its designee.  The bankruptcy

Trustee, in performing the duties of Plan administrator in accordance with 11 U.S.C. §704(a)(11)

never authorized the Plan Trustee to make such distributions to any of the Defendants.

According to Section 6.2 of the Trust Agreement, all fees and expenses incurred in the

administration of the Trust Fund shall be paid from assets of the Trust Fund, unless paid by the

Employer.  Here, I expect to incur reasonable and necessary fees in connection with the

termination of the Plan, which fees may be assessed against and paid by the Trust Fund.  As

such, I am seeking the equitable treatment of all Plan participants in connection with the pro rata

assessment of expenses associated with the termination of the Plan.  In order to obtain that relief,

3

I commenced an adversary proceeding against the Defendants. A copy of the Adversary Complaint is annexed hereto as Exhibit C.

6.    After starting to perform the duties of the Plan administrator, I learned that there is an ongoing investigation by the United States Attorney's Office which was triggered pre-petition when the United States Department of Homeland Security became aware of systematic transfers of substantial amounts of funds (reported by the Debtor's criminal defense counsel to be as much as One Billion ($1,000,000,000.00) Dollars), between several of the Debtor's corporate subsidiaries within the United States and related corporate entities internationally, allegedly in an effort to make a false showing of commerce and to artificially inflate sales figures and other business activity that never occurred. Given this history, the Insiders have the knowledge, ability, and contacts to easily transfer the Funds out of the country. Thus, the temporary restraining order and preliminary injunction are necessary to ensure that, upon the Insiders' notice that the Trustee is seeking to have their Funds restored back into the Plan, they can not transfer such funds outside the reach of this Court so as to avoid their pro rata assessment of costs and expenses relating to the termination of the Plan by the Trustee.

7.    In the underlying adversary proceeding I am seeking the restoration of the Insider's funds back into the Plan Trust Fund so that the remaining Plan participants share the costs of terminating the Plan with the Insiders on a pro rata basis. In seeking this relief, I am concerned that once the Insiders receive notice of my intentions to restore their Funds back into the Plan Trust Fund, they may transfer such funds out of the country, outside this Court's jurisdiction or otherwise dissipate, transfer or hypothecate these funds. If this happens, the remaining Plan participants would undoubtedly suffer irreparable harm because they would be forced to bear the entire burden of paying all costs and expenses associated with the Plan

termination without any contribution from the Insiders.  If the Insiders restore their distributions back to the Plan Trust Fund, the pool of available funds for the assessment of costs and expenses for Plan termination would more than double, thereby reducing the pro rata costs and expenses of the remaining participants by more than 50%.  In sum, it would be inequitable to force the remaining Plan participants to be assessed in a sum needed to pay all the costs and expenses incurred in connection with the termination of the Plan, while the Insiders of the Debtor are not assessed at all for such costs and expenses.   In view of the foregoing, I am requesting a temporary restraining order and a preliminary injunction pursuant to Rule 65(b) of the Federal Rules of Civil Procedure in order to restrain the Insiders' pension accounts to the extent they hold the post-Petition distributions pending the resolution of the underlying adversary proceeding.

8. No prior application for the relief sought herein has been made to this or any other Court.

WHEREFORE, it is respectfully requested that my application for a temporary restraining order and preliminary injunction be granted together with such other relief as the Court deems just and proper.

KENNETH KIRSCHENBAUM
Chapter 7 Bankruptcy Trustee

Sworn to before me this
20th day of April, 2011

_____
Notary Public

TAL HIRSHBERG
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02HI6212693
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES 10/19/2013

5

EXHIBIT "A"

# Plan Starter Kit

JPMorgan Chase Bank USA, N.A.

# ADP Prototype Plan
# Trust Agreement

This Agreement, made as of the date stated below, is by and between the undersigned (hereinafter referred to as the "Company") and THE JPMORGAN CHASE BANK, a banking organization organized under the laws of the State of New York (hereinafter referred to as the "Trustee"). The Company, on behalf of itself and its affiliates and wholly-owned subsidiaries (if any) and certain of its affiliates and wholly-owned subsidiaries and the Trustee hereby enter into this Agreement to constitute a trust as the funding vehicle for the tax qualified defined contribution plan established by the Company in connection with the Program, as defined below (the "Plan").

## ARTICLE 1. DEFINITIONS

Unless the context clearly indicates otherwise, terms defined in the Plan document have the same meaning when used in this Agreement. In addition, the following terms are defined as provided below.

"ADP" means ADP, Inc. and its affiliates (including such affiliates which possess the necessary licenses, registration and/or authorization for the performance of the applicable services involved) and assigns.

"Applicable Law" means, (in each case after taking into account the full preemptive effect of ERISA) (a) any applicable statute of a jurisdiction, whether federal, state, or local, in the United States, (b) any other law, rule, regulation or interpretation of any governmental entity having authority in the United States, or (c) any applicable federal or state common law applicable in the United States.

"Code" means the Internal Revenue Code of 1986 (and the regulations promulgated thereunder), as amended.

"Damage" means any liability, loss, cost, damage, penalty, fine, obligation or expense of any kind whatsoever (including, without limitation, reasonable attorneys', accountants', consultants' or experts' fees and disbursements).

"ERISA" means the Employee Retirement Income Security Act of 1974 (and the regulations promulgated thereunder), as amended.

"Group Trust" means a common, collective, or other group trust maintained by a bank or trust company (including, but not limited to, the Trustee).

"Participants" means Plan participants and/or their beneficiaries, as the case may be.

"Person" means a natural person, trust, estate, corporation of any kind or purpose, mutual company, joint-stock company, unincorporated organization, association, partnership, joint venture, employee organization, committee, board, participant, beneficiary, trustee, partner or venturer acting in an individual, fiduciary, or representative capacity, as the context may require.

"Program" means the ADP Retirement Services Program.

"Trust Fund" means all assets held by the Trustee in the trust under the provisions of this Trust Agreement at the time of reference.

## ARTICLE 2. THE TRUST FUND

### 2.1    The Plan.

The authority to conduct the general operation and administration of the Plan is vested in the Company. The Company may appoint one or more individuals (each referred to herein as the "Administrator") to act on its behalf, provided that instructions from the Company or the Administrator regarding payments to the Trust Fund, disbursements from the Trust Fund and investment of Trust Fund assets will be communicated to the Trustee solely by ADP on the Company's or the Administrator's behalf. If the Company does not appoint an Administrator, references herein to the Administrator shall be deemed to refer to the Company. The Trustee shall not be deemed a party to the Plan. The Company shall be responsible for verifying that the Plan is "qualified" within the meaning of Section 401(a) of the Code and is permitted by existing or future rulings of the United States Treasury Department to pool its funds in a group trust, and shall notify ADP and the Trustee if the Plan at any time fails to be so qualified.

### 2.2    Receipt of Assets.

The Trustee shall receive and accept into the Trust Fund money and other property paid to it by or at the direction of the Company (including rollovers from other qualified plans) as communicated by ADP on behalf of the Company, which are consistent with the Program and ADP's operational requirements, provided that transfers of property can only be made with the consent of ADP and the Trustee. The Trustee need not inquire into the source of any money or property transferred to it nor into the authority or right of the transferor of such money or property to transfer such money or property to the Trustee. The Trustee shall not be under any duty to require payment of any contributions to the Trust Fund, or to see that any payment made to it is computed in accordance with the provisions of the Plan, or otherwise be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan.

### 2.3    No Reversion to the Company.

Except as provided in this Agreement, no portion of the principal or the income of the Trust Fund shall revert to or be recoverable by the Company or ever be used for or diverted to any purpose other than for the expenses of administering the Plan or the Trust Fund or for the exclusive benefit of Participants in the Plan and Persons claiming under or through them pursuant to the Plan, provided, however, that:

(a)   if a contribution is conditioned upon the deductibility of the contribution under Section 404 of the Code, then, to the extent the deduction is disallowed, the Trustee shall, upon written request of the Company, return such amounts as may be permitted by law to the Company, within one year after the date the deduction is disallowed;

(b)   if a contribution or any portion thereof is made by a mistake of fact, the Trustee shall, upon written request of the Company, return such amounts as may be permitted by law to the Company within one year after the date of payment to the Trustee; and

(c)   assets may be returned to the Company to the extent that the law permits such transfer.

The Trustee shall be under no obligation to return any part of the Trust Fund as provided in this Section 2.3 until the Trustee has received a written certification from the Company that such return is in compliance with this Section 2.3, the Plan, and the requirements of Applicable Law. The Trustee shall rely conclusively on such written certification and shall be under no obligation to investigate or otherwise determine its propriety.

### 2.4    Non-Alienation of Benefits.

No benefit to which a Participant is or may become entitled under a Plan shall at any time be subject in any manner to alienation or encumbrance, nor be resorted to, appropriated or seized in any proceeding at law, in equity or otherwise, except as may be ordered under a "Qualified Domestic Relations Order" as defined in ERISA and the Code or as required by a federal tax levy made in accordance with Section 6331 of the Code. No Participant or other Person entitled to receive a benefit under the Plan shall, except as specifically provided in the Plan, have power in any manner to transfer, assign, alienate or in any way encumber his or her benefit under the Plan, or any part thereof, and any attempt to do so shall be void.

### 2.5    No Guaranties.

Neither the Company nor the Trustee guaranties the Trust Fund from loss or depreciation, nor the payment of any amount which may become due to any Person under the Plan or this Trust Agreement.

### 2.6    Valuation of the Trust Fund.

The Trustee shall determine the fair market value or fair value of property held in the Trust Fund as follows: the value of units or shares in registered investment companies, Group Trusts, or other investment funds (each a "Fund") shall be their net asset value or other unit or share value as announced by the Fund or its agent. Such other investments permitted under the Program shall be valued in accordance with the Trustee's procedures for valuing securities traded in the same market.



Property held in any Participant Directed Brokerage Account shall be valued by the broker maintaining the Participant Directed Brokerage Account, and the Trustee shall not review such valuations.

### ARTICLE 3. DISBURSEMENTS FROM THE TRUST FUND

The Trustee shall from time to time on the directions of the Company, as communicated by ADP on behalf of the Company, make payments out of the Trust Fund in cash or in-kind to such Persons, including the Company, in such manner, in such amounts and for such purposes as may be specified in those directions of the Company. Payment in response to such directions shall be a complete discharge of the Trustee of its responsibility for the holding and safekeeping of such assets and any assets so paid over shall no longer be part of the Trust Fund. The Company shall be responsible for insuring that any payment directed under this Article conforms to the provisions of the Plan, this Trust Agreement, and the provisions of ERISA. The Trustee shall not incur any liability or other damage on account of any payments or other distributions made by it in accordance with the written directions of the Company or ADP acting on behalf of the Company.

### ARTICLE 4. INVESTMENT OF THE TRUST FUND

4.1    Establishment of Investment Funds.

(a)    The Company, from time to time and in accordance with provisions of the Plan, shall direct the Trustee to establish one or more separate investment accounts within the Trust Fund (each an 'Investment Fund'). Each separate Investment Fund shall either (i) consist of an investment alternative made available by ADP under the Program, (ii) be a variable annuity contract issued by an insurance company, (iii) consist of conventional guaranteed investment contracts or an unmanaged pool of broadly traded debt securities backed by the guaranty of a bank, insurance company, or similar institution or (iv) be separate brokerage accounts made available by ADP under the Program, which accounts shall be subject to the investment direction of a Participant (a "Participant Directed Brokerage Account"). The Trustee shall transfer to each Investment Fund those assets of the Trust Fund as the Company directs through ADP. The Trustee shall be under no duty to question, and shall not incur any liability on account of following, any direction of the Company with respect to the establishment or elimination of any Investment Fund or the allocation or transfer of money or property between or among Investment Funds.

(b)    All interest, dividends, other income, or proceeds received with respect to an Investment Fund shall be credited to and reinvested in that Investment Fund. All expenses of the Trust Fund which are allocable to a particular Investment Fund shall be so allocated and charged.

(c)    When permissible under the Program, the Company may appoint an investment manager as defined in Section 3(38) of ERISA, which shall have the authority to manage assets of an Investment Fund. The investment manager must acknowledge in writing that it is a fiduciary with respect to the Plan.

4.2    Investment of Plan Assets.

(a)    The Company, through instructions provided to ADP, may direct the Trustee to allocate the assets of the Plan among the Investment Funds and neither the Trustee nor ADP shall be responsible for or have any duty to review such investment directions; provided, however, unless the Company shall notify ADP and the Trustee in writing to the contrary, the Company, through ADP, will direct the Trustee to invest the assets of the Plan as directed by participants among the Investment Funds selected by the Company. Except with respect to a limited period of time in connection with the conversion of the Plan from a prior recordkeeper to ADP, each Participant will have investment control over his or her account within the Plan, subject to the administrative rules and procedures of ADP, the Trustee and any investment vehicle comprising an Investment Fund. Except as provided in Section 4.2(b), ADP shall receive Participant investment instructions regarding the investment of his or her account in Investment Funds or the transfer of his or her account among Investment Funds and shall communicate instructions to the Trustee in order to effectuate such Participant investment instructions.

(b)    If investment instructions accompanying contributions or otherwise regarding investments for a Participant's account (s) are not received or are unclear in the opinion of the Trustee or its agent,

the Trustee may hold any part of the assets affected by such missing or unclear instructions in cash, or may return contributions, in either case without liability for interest, rising or falling securities prices, or other income, pending receipt of clear and complete instructions. The Trustee or its agent will, in the case of missing or unclear instructions, seek prompt clarification of unclear instructions or prompt furnishing of missing instructions.

(c)    Notwithstanding any other provision of this Trust Agreement to the contrary, the following provisions shall apply to Participant Directed Brokerage Accounts. If so directed by the Company, the Trustee shall segregate all or a portion of the assets of the Plan that are held in Trust into one or more Participant Directed Brokerage Accounts. Each Participant shall have the power to direct the investment and reinvestment of any Participant Directed Brokerage Account established for his or her benefit, subject to such administrative rules and procedures as ADP and Chase may establish. A Participant shall have the power and duty to exercise the rights described in Section 4.5 with respect to the assets held in a Participant Directed Brokerage Account. The Trustee shall be fully protected regarding directions or the absence of directions from Participants with respect to Participant Directed Brokerage Accounts in accordance with Section 4.5(b). Participants shall be entitled to provide instructions regarding the investment of Participant Directed Brokerage Accounts directly to the broker appointed for purposes of executing transactions under the account. That broker shall hold custody of property held in a Participant Directed Brokerage Account, and the Trustee shall have no responsibility for the acts or omissions of any such broker. The following securities may be purchased or sold under Participant Directed Brokerage Accounts: preferred and common stocks (other than employer securities of the Company), or other listed securities on the New York or American stock exchanges; all stocks listed on the NASDO; corporate and government bonds; treasury and government issues, and selected registered mutual funds as determined by the brokerage firm. Neither ADP nor the Trustee shall have any responsibility for the broker's failure to limit securities purchased or sold under any Participant Directed Brokerage Account to such eligible securities.

4.3    Group Trusts.

(a)    In the event that an investment alternative which the Company selects for the Plan is all or in part a Group Trust, the Company, by so selecting the Group Trust or other investment alternative, shall be deemed to have appointed the manager of the Group Trust as an investment manager of the Plan for purposes of Section 403(a)(2) of ERISA with respect to money and property allocated to the Investment Fund consisting of that Group Trust, and such investment manager may issue orders for the purchase or sale of securities directly to a broker-dealer. The Trustee shall be deemed to be directed by the Company to execute any adoption agreements, ancillary trust agreements, custody agreements, or other documentation necessary to facilitate the Plan's investment in such a Group Trust.

(b)    To the extent that any portion of the Trust Fund is invested in a Group Trust, the instruments governing that Group Trust and any ancillary trust or custody agreement relating to the Trust Fund's investment therein is made a part of the Plan and is hereby incorporated by reference into this Agreement.

4.4    Proxies and Corporate Actions.

The Trustee shall transmit promptly to the Company all proxies and notices of conversion, redemption, tender, exchange, subscription, class action, claim insolvency proceedings or other rights or powers relating to any Investment Fund (other than securities held in a Group Trust or a Participant Directed Brokerage Account) and shall act on such proxies and practices only as and if directed by the Company. The Trustee shall not be liable for any untimely exercise or assertion of any rights or powers associated with any proxy or notice unless it receives directions to exercise the same from the Company, at least three business days prior to the date on which such rights or powers are to be exercised.

4.5    Section 404(c) Compliance.

(a)    If the investment of Plan assets is to be directed by Participants, the Company shall be solely responsible for the Plan satisfying the various criteria set forth in Department of Labor Regulation section

404c-1 for qualification as an "ERISA Section 404(c) Plan." Thus, among other things, the Company is solely responsible for satisfying the Regulation's criteria with respect to selecting a broad range of investment alternatives among which Participants may designate investment of their accounts, providing Participants with information made available from time to time by ADP concerning the designated investment alternatives, and restricting the frequency with which Participants may issue investment instructions. If the Plan fails at any time to qualify as an ERISA Section 404(c) Plan with respect to a transaction or series of transactions, all of such transactions that are participant-directed investments shall be deemed to have been directed by the Company. Except as provided in Section 4.2(b), all investment directions from Participants shall be delivered to ADP.

(b) Participants directing their investments shall be solely responsible for the designation of investments for their individual accounts, and the Trustee shall not be responsible or have any authority with respect to any such designation except as required by ERISA. Further, the Trustee shall not be responsible for the selection or review of investment alternatives for the Plan, be obligated to review investments held in any Participant-directed accounts, or be responsible for the failure of any Participant to diversify investments.

**4.6     Investments in Group Annuity Contracts**

If the Company selects a group annuity contract, including a variable annuity contract, as the investment vehicle under the Plan, the Company represents that it has received and reviewed a specimen form of such group annuity contract and hereby directs the Trustee to execute the insurance application and group annuity contract and to take such other actions as may be required to effectuate such investment. No insurance company that issues any group annuity contract held under the Plan shall be deemed a party to this Agreement for any purpose, nor shall it have any liability hereunder other than as provided in each group annuity contract that it may issue.

## ARTICLE 5.  POWERS OF THE TRUSTEE

**5.1     Investment Powers of the Trustee.**

The Trustee shall have and exercise the following powers and authority upon direction of the Company, or (except with respect to Section 5.1(i), below) upon the direction of any investment manager appointed by the Company under Section 4.1(c), in accordance with this Agreement:

(a) To purchase, receive or subscribe for securities and any other type of property and to retain in trust such securities;

(b) To sell for cash or on credit, to grant options, convert, redeem, exchange for other property, to enter into standby agreements for future investment, either with or without a standby fee, or otherwise to dispose of any property at any time held by it;

(c) To settle, compromise or submit to arbitration any claims, debts, or damages, due or owing to or from the trust, to commence or defend suits or legal proceedings and to represent the trust in all suits or legal proceedings in any court of law or before any other body or tribunal;

(d) To exercise all voting rights, tender or exchange rights, any conversion privileges, subscription rights and other rights and powers available in connection with any property at any time held by it; to oppose or to consent to the reorganization, consolidation, merger or readjustment of the finances of any corporation, company or association, or to the sale, mortgage, pledge or lease of the property of any corporation, company or association any of the property which may at any time be held by it and to do any act with reference thereto, including the exercise of options, the making of agreements or subscriptions and the payment of expenses, assessments or subscriptions, and to hold and retain any property which it may so acquire; and to deposit any property with any protective, reorganization or similar committee, and to pay and agree to pay part of the expenses and compensation of any such committee and any assessments levied with respect to property so deposited;

(e) To invest all or a portion of the Trust Fund in contracts issued by insurance companies;

(f) To hold part or all of the Trust Fund uninvested as contemplated by the Program or to the extent that the directing party ascertains as reasonable and necessary for limited periods of time;

(g) To borrow money on a secured or unsecured basis and to enter into, execute, and deliver notes, agreements, mortgages, and other instruments in that regard;

(h) To invest at the Trustee (i) in any type of interest bearing investments (including, but not limited to savings accounts, money market accounts, certificates of deposit and repurchase agreements) and (ii) in non-interest bearing accounts (including, but not limited to checking accounts); and

(i) To appoint ancillary trustees to hold any portion of the assets of the trust and to pay their reasonable expenses and compensation.

**5.2     Administrative Powers of the Trustee.**

(a) The Trustee shall have the following powers and authority, to be exercised in its sole discretion, with respect to the Trust Fund:

(i) To employ suitable agents (including ADP or its affiliates or affiliates of the Trustee), custodians and counsel and to pay their reasonable expenses and compensation;

(ii) To register any securities held by it hereunder in its own name or in the name of a nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity and to hold any securities in bearer form and to deposit any securities in a depository or clearing corporation;

(iii) To permit overdrafts in any Investment Fund in connection with the settlement of investment transactions relating to, or the distribution of funds from, the Trust Fund (and the Investment Manager, if any, of such Investment Fund shall be deemed to have requested the Trustee to permit such overdraft under the terms and conditions announced by the Trustee from time to time for overdrafts); to repay any such overdraft out of the Trust Fund; to permit the party extending any such overdraft (including the Trustee in its corporate capacity) to set the overdraft off against any cash balances in the Trust Fund; and to pay reasonable compensation to the party extending the overdraft for its services (or reimburse that party for its expenses) to the extent permitted under Applicable Law;

(iv) To reverse any erroneous or provisional credit entries to the Trust Fund retroactively to the date upon which the correct entry or no entry should have been made;

(v) To make, execute and deliver, as Trustee, any and all documents, conveyances, waivers, releases or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers; and

(vi) Generally to do all ministerial acts, whether or not expressly authorized, which the Trustee may deem necessary or desirable in carrying out its duties under this Trust Agreement.

Except as otherwise required by ERISA, the Trustee shall not be responsible for the acts or omissions of any agent selected by it, provided that the Trustee satisfies the applicable standard of care under Section 6.1 of this Agreement with respect to selecting the agent and maintaining the agency relationship.

(b) The Trustee may consult with legal counsel concerning questions which may arise with reference to this Trust Agreement and its powers and duties as trustee. To the extent permissible by Applicable Law, the written opinion of such counsel shall be full and complete protection of the Trustee in respect to any action taken or suffered by the Trustee hereunder in good faith reliance on the opinion.

## ARTICLE 6.  RESPONSIBILITY OF TRUSTEE; INDEMNIFICATION; CONTRIBUTION

**6.1     Responsibility of Trustee.**

(a) The Trustee shall be responsible for the performance of only such duties as are set forth in this Agreement (or otherwise agreed upon in writing by the Trustee), are expressly imposed on the Trustee by ERISA, or expressly contained in instructions from the Company, an investment manager or ADP which are consistent with the provisions of this Agreement and with the Trustee's operations and procedures. The Trustee shall perform those duties under this Agreement which constitute it as a fiduciary under ERISA in accordance with the standard of care set forth in Section 404(a) of ERISA; the Trustee shall exercise reasonable care with respect to

its remaining duties and obligations under this Agreement. Except as otherwise required by ERISA, under no circumstances shall the Trustee incur liability to any Person for any indirect, consequential or special damages (including, without limitation, lost profits) of any form, whether or not foreseeable and regardless of the form of the action in which such a claim may be brought, with respect to the Trust or its role as Trustee.

(b)  The Trustee shall have no obligation to undertake, defend or continue to maintain any action or proceeding arising in connection with the Trust, unless and until the Company agrees in writing to indemnify the Trustee against the Trustee's costs, expenses and liabilities (including, without limitation, attorneys' fees and expenses) relating thereto, to be primarily liable for such payment and to make periodic payments in respect of such fees and expenses during the course of such proceedings. If the Company thereafter does not pay such costs, expenses and liabilities in a reasonably timely manner, the Trustee shall discontinue participation in such action or proceeding, and charge the assets of the Trust Fund to the extent sufficient for any unpaid fees and expenses.

(c)  The Trustee shall have no duty or responsibility to direct the investment and reinvestment of the Trust Fund or any investment Fund except insofar as it relates to the management of a Group Trust which is maintained by the Trustee.

6.2   Indemnification and Contribution.

(a)  The Company shall indemnify and save harmless the Trustee, its affiliates, and their officers, agents, and employees for and from any Damage arising (i) out of any matter as to which the Trustee is directed, in this Agreement provides that the Trustee is protected, not liable, or not responsible, or as to which the Trustee has acted in accordance with this Agreement and ERISA, or (ii) by reason of any breach of any statutory or other duty owed to the Plan by the Company, the Administrator, the sponsor or manager of any Group Trust, or any delegate of any of them, whether or not the Trustee may also be considered liable for that other person's breach under the provisions of Section 405(a) of ERISA.

(b)  The Trustee, ADP, their affiliates, and their respective officers, agents and employees may bring action against the Company to contribute to the satisfaction of any Damage to the extent that the Damage (i) is not subject to indemnification under Sub-section (a) and (ii) is caused by the culpable conduct of the Company, the Administrator or any of their respective affiliates or agents.

(c)  The foregoing rights of indemnification and contribution shall not limit any rights or remedies which may be available to the Trustee under Applicable Law.

6.3   Authority of Company; Power to Designate Persons Authorized to Act.

(a)  The Trustee may continue to rely on the authority of each Person designated by the Company to act as Administrator, or otherwise to act on behalf of the Company until notified that such Person has ceased to act in that capacity. The Company hereby appoints ADP to give instructions and directions to the Trustee as contemplated by the Program and authorizes ADP to obtain information from the Trustee (by on-line access or otherwise) concerning the Trust Fund and any payment or transaction relating to the Trust Fund.

(b)  The Company or the Administrator may appoint one or more Persons (who may, but are not required to be employees of the Company) to act on their behalf on matters relating to the Trust Fund and this Agreement, and, from time to time, shall certify to the Trustee the name or names of any Person or Persons so authorized to act. The Trustee may continue to rely on the authority of any Person to act individually for the Company or the Administrator until the Company or the Administrator notifies the Trustee that that Person is no longer authorized to act on the Company or the Administrator's behalf.

(c)  Any investment manager may designate one or more persons to give instructions or directions on behalf of such Investment Manager.

6.4   Action by the Company or Administrator; Investment Managers.

(a)  Unless otherwise specifically required by this Agreement, directives, instructions, and other communications under this Agreement or relating to the Trust Fund (including without

limitation, instructions regarding the investments of the Trust Fund and directions to make benefit payments and other disbursements) may be provided in writing or by telephone, facsimile transmission, or other teleprocess or electronic instruction or trade information system acceptable to the Trustee by any Person authorized under Section 6.3 to act, or in the case of investments, by Participants.

(b)  The Trustee shall be fully protected in acting upon any directive, instruction, instrument, certificate, paper, or other communication of the Company, the Administrator, ADP, or any investment manager however delivered, believed by it to be genuine and to be signed or presented by any authorized Person. The Trustee also may treat as genuine and authorized any document bearing or purporting to bear the facsimile signature of an individual authorized to provide a directive, instrument, certificate, paper, or other communication under this Agreement, regardless of by whom or by what means the actual or purported facsimile signature or signatures may have been affixed if such facsimile signature or signatures resemble the facsimile specimen or specimens from time to time furnished to the Trustee under this Agreement. The Trustee shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing but may accept the same as fully authorized by the Company, the Administrator, or the investment manager.

(c)  Each direction, notice, request or approval (whether or not certified to the Trustee in writing) by the Company or the Administrator, shall constitute a certification by the Company to the Trustee that such direction is in conformity with the terms of the Plan and Applicable Law, and the Trustee may conclusively rely on such certification without further investigation unless the Trustee has actual knowledge to the contrary.

### ARTICLE 7. TAXES AND TRUSTEE COMPENSATION

7.1   Taxes.

The Trustee shall pay out of the Trust Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws against the Trust Fund. Until advised to the contrary by the Company, the Trustee shall assume that the Trust is exempt from Federal, state and local income taxes, and shall act in accordance with that assumption. The Company shall timely file all Federal, state and local taxes and information returns relating to the Plan and Trust.

7.2   Expenses and Compensation.

(a)  Trustee shall be paid such reasonable compensation as shall from time to time be agreed upon by the Company and the Trustee. Such compensation and all reasonable and proper expenses of administration of the Plan and Trust, including counsel fees relating to the Trust, shall be withdrawn by the Trustee out of the Trust Fund unless paid by the Company, but such compensation and expenses shall be paid by the Company if the same cannot by operation of law be withdrawn from the Trust Fund. The Trustee shall be entitled, as an additional part of its compensation under this Agreement, to the use of funds which may be held in demand deposit or other non-interest bearing accounts established for the payment of benefits or Plan disbursements or which are otherwise maintained for purposes of administering the Trust Fund.

(b)  All payments under this Article 7, including payments to ADP for services, may be made from the Trust Fund in the event that the Company has not paid same (in the case of ADP, within 30 days of the date they are due to be paid) or notified Trustee in writing of its intent to pay the billing period subsequent to the charge without approval or direction of the Company. The Company hereby authorizes the Trustee to liquidate assets in the Trust in order provide such payment, first from available free cash balances, second from balances held in any forfeiture account and third pro rata from all Investment Funds. The Trustee shall be fully protected in, and shall not incur any liability for, any payment to ADP pursuant to this Section 7.1(b).

### ARTICLE 8. ACCOUNTS OF THE TRUSTEE

8.1   Books and Records Relating to the Trust.

The Trustee shall maintain or cause to be maintained suitable records, data and information relating to its functions hereunder.

8.2    Trust Accountings.

(a)    Within sixty days after the close of each month and at more frequent intervals if agreed to by the parties hereto, and within sixty days after the removal or resignation of the Trustee as provided hereunder, the Trustee shall render to the Company a written statement and account showing in reasonable summary the investments, receipts, disbursements, and other transactions engaged in during the preceding fiscal year or period, and setting forth the assets and liabilities of the trust. The fiscal year of the Trust shall coincide with the plan year of the Plan. The Company shall promptly review each such statement and account and promptly notify the Trustee in writing of any errors or omissions reflected therein. Unless the Company shall have filed with the Trustee written exceptions or objections to any such statement and account within sixty days after receipt thereof, the Company shall be deemed to have approved such statement and account, and in such case or upon written approval by the Company of any such statement and account, the Trustee shall be released and discharged with respect to all matters and things embraced in such statement and account to the full extent permissible under Applicable Law as though it had been settled by a decree of a court of competent jurisdiction in an action or proceeding in which the Company, all other necessary parties and all Persons having any beneficial interest in the Trust Fund were parties.

(b)    Nothing contained in this Trust Agreement or in the Plan shall deprive the Trustee of the rights to have a judicial settlement of its account, in any proceeding for a judicial settlement of the Trustee's accounts or for instructions in connection with the trust, the only necessary party thereto in addition to the Trustee shall be the Company, and no Participant or other Person having or claiming any interest in the Trust Fund shall be entitled to any notice or service of process [except as required by Applicable Law]. Any judgment, decision or award entered in any such proceeding or action shall be conclusive upon all interested Persons.

### ARTICLE 9. RESIGNATION AND REMOVAL OF TRUSTEE

The Trustee may resign at any time by giving sixty days' prior written notice to the Company, which notice may be waived by the Company. The Company may remove the Trustee at any time upon sixty days' prior written notice to the Trustee, which notice may be waived by the Trustee. In the event the Company withdraws from the Program, the Trustee shall be deemed to have been removed effective upon the Company's withdrawal from the Program. In the event that the Company removes the Trustee, the Company shall be deemed to have withdrawn from the Program as the effective date of the Trustee's removal. In case of the resignation or removal of the Trustee, the Company shall appoint a successor trustee which is a bank or trust company or similar financial institution, unless the Trustee otherwise agrees in writing. Any successor trustee shall have the same powers and duties as those conferred upon the Trustee named in this Trust Agreement. The removal of a Trustee and the appointment of a new Trustee shall be by a written instrument delivered to the Trustee. Upon the appointment of a successor trustee and after the final account of the resigning or removed Trustee has been approved or settled, as provided in Article 9, the resigning or removed Trustee shall transfer or deliver the Trust Fund to such successor trustee or, in its discretion, to a court of competent jurisdiction if a successor trustee has not accepted appointment within a reasonable time. Following the effective date of the appointment of a successor trustee, the Trustee shall not accept receipt of any assets of the Trust Fund.

### ARTICLE 10. TERMINATION

This Trust Agreement and the trust created hereby may be terminated at any time by the Company, and upon such termination or upon the dissolution or liquidation of the Company, in the event that a successor to the Company by operation of law or by the acquisition of its business interests shall not elect to continue the Plan and the trust, the Trust Fund shall be paid out by the Trustee after the settlement of its final account when directed by the Company. Notwithstanding the foregoing, the Trustee shall not be required to pay out any assets of the Trust Fund upon termination of the Trust until the Trustee has received determinations, releases, written certifications and indemnities from the Company which are satisfactory to it. The Trustee may rely conclusively on such written certification, and shall be under no obligation to investigate or otherwise determine its propriety.

### ARTICLE 11. MISCELLANEOUS

11.1    Governing Law and Jurisdiction.

This Agreement and the trust created hereby shall be construed, regulated, and administered under the laws of the United States or State of New York, as applicable, without regard to New York's principles regarding conflicts of law. Except where otherwise specifically required by ERISA, the appropriate state and federal courts located in New York County and the State of New York each shall have jurisdiction over any lawsuit or other judicial proceeding relating to or arising from this Agreement. Any of these courts shall have proper venue for any such lawsuit or judicial proceeding, and the parties waive any objection to venue or their convenience as a forum. The parties agree to submit to the jurisdiction of any of the courts specified and to accept service of process to vest personal jurisdiction over them in any of these courts. The parties further hereby knowingly, voluntarily and intentionally waive, to the fullest extent permitted by Applicable Law, any right to a trial by jury with respect to any such lawsuit or judicial proceeding arising or relating to this Agreement or the transactions contemplated hereby.

11.2    Amendment.

This Trust Agreement sets out the entire agreement between the parties in connection with the subject matter, and this agreement supersedes any other agreement, statement, or representation relating to the obligations of the Trustee, whether oral or written. This Trust Agreement may be amended by written agreement between the Trustee and the Company at any time or from time to time, and the provisions of any such amendment may be applicable to the Trust Fund as constituted at the time of the amendment as well as to the part of the Trust Fund subsequently acquired.

11.3    Duty to Furnish Information.

Both the Company and the Trustee shall furnish to the other any documents, reports, returns, statements, or other information that the other reasonably deems necessary to perform its duties imposed under the Plan or this Trust Agreement or otherwise imposed by Applicable Law.

11.4    Withholding.

Upon receiving instructions to do so from ADP, the Trustee shall withhold any tax which by any present or future law is required to be withheld from any payment under the Plan, unless the Trustee shall have agreed in writing to do such withholding without ADP's instruction. ADP shall provide all information reasonably requested by the Trustee to enable the Trustee to so withhold.

11.5    Force Majeure.

Neither the Trustee nor ADP shall be liable to the Plan or any other Person for any loss due to forces beyond its control including, but not limited to strikes or work stoppages, fire, telecommunications failure, acts of war (whether declared or undeclared) or terrorism, insurrection, revolution, nuclear fusion, fission or radiation, or acts of God.

11.6    Necessary Parties to Disputes.

Necessary parties to any accounting, litigation or other proceedings shall include only the Trustee and the Company, and the settlement or judgment in any such case in which the Company and the Trustee are duly served or cited shall be binding upon the Company, each Employer, and all Participants and their estates, and upon all Persons claiming by, through or under them.

11.7    Severability.

If any provisions of this Trust Agreement shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of this Trust Agreement shall continue to be fully effective.

11.8    References.

Unless the context clearly indicates to the contrary, a reference to a statute, regulation, document or provision shall be construed as referring to any subsequently enacted, adopted or executed counterpart.

11.9    Headings.

Headings and subheadings in this Trust Agreement are inserted for convenience of reference only and are not to be considered in the construction of its provisions.

11.10   No Liability for Acts of Predecessor and Successor Trustees.

The Trustee shall have no liability for the acts or omissions of any predecessors or successors in office.

11.11   Status of ADP.

The Company acknowledge that ADP does not have (a) any discretionary authority or discretionary control respecting management of the Plan or management or disposition of Plan assets, (b) authority or responsibility to render investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the Plan, or (c) discretionary authority or discretionary responsibility in the administration of the Plan. The Company acknowledges that the respective rights of the Company and ADP regarding any services ADP provides with respect to the Plan will be governed by the services agreement entered into with respect thereto.

11.12   Counterparts.

This Trust Agreement may be executed in one or more counterparts, each of which shall constitute an original.

In witness of the foregoing, the undersigned have caused this instrument to be executed by their duly authorized officers as of _____.

Name of Company: _Synergy Brands, Inc_____

By: _____

Title: _____CFO_____

Address for Notices:

_____

_____

Attn: _____

Phone: _____

Fax: _____

THE JPMORGAN CHASE BANK

By: _____

Title: _____

Address for Notices:

1 Chase Manhattan Plaza, 19th Floor
New York, NY 10005
Attn: ADP Retirement Services Program Administrator

*New Trust Agreement*

# TRUST
# AGREEMENT

99-2281-0710

# TABLE OF CONTENTS

<div align="right">Page</div>

## ARTICLE I
## ESTABLISHMENT

| | | |
|---|---|---|
| 1.1 | Establishment of Trust | 1 |
| 1.2 | Plan Qualification | 2 |
| 1.3 | Standard of Care | 2 |

## ARTICLE II
## ADMINISTRATION OF TRUST FUND

| | | |
|---|---|---|
| 2.1 | General Administration | 2 |
| 2.2 | Contributions to Trust | 3 |
| 2.3 | Accounts | 3 |
| 2.4 | Distributions from Trust | 4 |

## ARTICLE III
## INVESTMENT DIRECTION

| | | |
|---|---|---|
| 3.1 | Directed Trustee | 4 |
| 3.2 | Named Fiduciary-Investment Direction | 5 |
| 3.3 | Employer Securities | 5 |
| 3.4 | Insurance and Annuity Contracts | 5 |
| 3.5 | Group Trusts | 6 |
| 3.6 | Short-Term Holdings Pending Instructions | 7 |

## ARTICLE IV
## POWERS OF TRUSTEE

| | | |
|---|---|---|
| 4.1 | Directed Powers of the Trustee | 7 |
| 4.2 | Discretionary Powers of the Trustee | 9 |
| 4.3 | Delegation | 10 |
| 4.4 | Delivery and Custody of Funds and Securities | 10 |
| 4.5 | Voting | 10 |

## ARTICLE V
## ACCOUNTINGS

| | | |
|---|---|---|
| 5.1 | Valuation and Reports. | 10 |
| 5.2 | Approval of Account | 11 |

ARTICLE VI
COMPENSATION, FEES AND TAXES

6.1   Trustee Compensation ....................................................................................11
6.2   Fees ................................................................................................................12
6.3   Method of Payment........................................................................................12
6.4   Taxes...............................................................................................................12

ARTICLE VII
RESIGNATION

7.1   Resignation or Removal of Trustee. ..............................................................13

ARTICLE VIII
PROTECTION/LIMITATION ON LIABILITY FOR TRUSTEE

8.1   Trustee's Protection .......................................................................................14
8.2   Reliance by Trustee. .......................................................................................14
8.3   Absence of Instructions ..................................................................................14
8.4   Indemnification by the Employer and Plan Administrator.............................15
8.5   Force Majeure .................................................................................................15

ARTICLE IX
PROHIBITION OF DIVERSION

9.1   Prohibition of Diversion. ................................................................................16

ARTICLE X
AMENDMENT AND TERMINATION OF THE TRUST

10.1  Amendment......................................................................................................17
10.2  Termination......................................................................................................17

ARTICLE XI
MISCELLANEOUS PROVISIONS

11.1  Relationship to Plan .......................................................................................17
11.2  Nonalienation..................................................................................................17
11.3  Certification of Trust Agreement...................................................................18
11.4  Not a Party to Trust........................................................................................18
11.5  Governing Law ...............................................................................................18
11.6  Definition of Employer...................................................................................18
11.7  Titles ...............................................................................................................18
11.8  Counterparts....................................................................................................18
11.9  Severability .....................................................................................................18
11.10 Written Notice.................................................................................................18
11.11 No Third Party Beneficiaries .........................................................................19
11.12 Authority and Role of Employer....................................................................19

# TRUST AGREEMENT

This Trust Agreement is made and entered into as of the _19_ day of _November_, 20_10_, by and among _Synergy Brands Inc._____, (hereinafter referred to as the "Employer") and Reliance Trust Company (hereinafter referred to as the "Trustee").

## W I T N E S S E T H:

**WHEREAS**, the Employer has duly established the _Synergy Brands Inc. 401(k) Profit Sharing Plan_, hereinafter called the "Plan," for certain of its employees and the employees of other adopting employers, if so provided in the Plan, and has authorized the creation of a Trust Fund to be administered under the Plan by the Trustee, to which Trust Fund contributions are to be made from time to time by the Employer and the other adopting employers, to be used for the exclusive benefit of its employees and their successors in interest in accordance with the provisions of the Plan and as hereinafter set forth; and

**WHEREAS**, the Trustee is willing to serve as a directed trustee and to hold and administer such contributions and other property pursuant to the terms of the Plan and this Trust Agreement;

**NOW, THEREFORE,** the Employer and the Trustee agree as follows:

## ARTICLE I
## ESTABLISHMENT

1.1     Establishment of Trust.  The Employer hereby establishes the Trust to hold assets of the Plan, which will consist of amounts contributed or transferred to the Trustee, investments and proceeds thereof and earnings (minus losses) thereon, reduced by payments from the Trust as provided herein.  If the Plan ceases at any time and for any reason to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended ("Code"), the Trust will not be made available, nor will it remain available, to the Employer.  In addition, the Trust will not be made available, nor will it remain available, to any Employer who does not contribute 100% of the tax qualified Plan's assets to it, or who fails to maintain 100% of the Plan's assets within it; provided, however, that this restriction to the Employer does not apply to the following plan assets:

(i)     Plan assets held in trust by a trustee other than Reliance Trust Company; and

(ii)     Plan assets held under an insurance company group annuity contract not issued to Reliance Trust Company as Plan Trustee.

The Employer hereby appoints Reliance Trust Company as Trustee of the Trust with respect to the Trust Fund. The Trustee, by executing this Trust Agreement, accepts its appointment as Trustee and agrees to administer the Trust as provided herein.

1.2    Plan Qualification. The Employer hereby represents that the Plan is a qualified plan under Section 401(a) of the Code, and agrees to notify the Trustee if it has reason to believe the Plan has ceased or will cease to be so qualified. The Trustee will have no liability or responsibility for the validity, legal effect or tax qualification of the Plan. The Trust is intended to comply with the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and to be tax-exempt under Section 501(a) of the Code.

1.3    Standard of Care. This Trust shall be administered by the Trustee solely in the interest of and for the exclusive purpose of providing benefits to Participants, Beneficiaries and their successors in interest and shall be administered in accordance with the provisions of the Plan and of ERISA and this Agreement. The Trustee shall discharge its duties with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. The Trustee shall not be responsible for the title, validity or genuineness of any property or evidence of title thereto received by it or delivered by it pursuant to this Agreement and shall be held harmless in acting upon any notice, request, direction, instruction, consent, certification or other instrument believed by it to be genuine and delivered by the proper party or parties. The Trustee shall not be responsible or liable for any losses or damages suffered by the Trust Fund arising as a result of the insolvency or any custodian, subtrustee or subcustodian.

## ARTICLE II
## ADMINISTRATION OF TRUST FUND

2.1    General Administration. This Trust Fund shall be a part of the Plan and shall be administered by the Trustee for the exclusive purposes of providing benefits to Participants, as defined in the Plan, and their successors in interest, and defraying reasonable expenses of administering the Plan. The Trustee is not a party to, and has no duties or responsibilities under, the Plan other than those that may be expressly contained in this Agreement. In any case in which a provision of this Agreement conflicts with any provision of the Plan, this Agreement shall control. Any instruction, direction or other communication made by the Employer or the Named Fiduciary or any of their designees to the Trustee must be made in a manner consistent with the Trustee's operational and systems framework, which shall include the requirement that, unless the Trustee otherwise agrees in writing, all communications regarding the Plan that are to be provided to the Trustee under this Agreement, including investment elections or directions from Participants, be forwarded to the "Recordkeeper," as defined in Section 4.3 of this Agreement. The Trustee shall take actions that it is required or permitted to take under this Agreement based on directions from the Recordkeeper that are provided to the Trustee by the Recordkeeper on behalf of the Employer or the Named Fiduciary, provided that nothing contained in this Agreement shall be read or purport to cause the

Recordkeeper to be considered a fiduciary (within the meaning of Section 3(21) of ERISA) with respect to the Plan. The Employer and Trustee agree that the Recordkeeper shall provide and receive instructions only in an agency capacity.

2.2     Contributions to Trust. The Trustee will accept contributions in cash, or in such other form as may be acceptable to the Trustee, made by or on behalf of Participants as it receives from time to time from the Employer, and such assets as may be transferred by Participants or by the trustee or custodian of another qualified plan or individual retirement account. Solely to the extent administratively and operationally feasible (as determined by the Trustee and the Recordkeeper), in-kind contributions other than qualifying Employer Securities will be permitted in non-pension plans (i.e., profit-sharing plans as defined in Treasury Regulation §1.401-1(b)) as long as they are discretionary and unencumbered. Solely to the extent administratively and operationally feasible (as determined by the Trustee and the Recordkeeper), Qualifying Employer Securities may be contributed to both pension (as defined in Treasury Regulation §1.401-1(b)) and non-pension plans subject to the requirements of ERISA Section 408(e).

The Trustee will have no responsibility for determining the time or amount of any contribution to the Trust or enforcing the collection of any contribution. Also, the Trustee will have no responsibility for determining that contributions satisfy any applicable requirement of the Plan or law, including, but not limited to, the minimum contribution requirements of Code Sections 412 and 416. Also, the Trustee will have no responsibility for determining whether the amount of any contribution (or the portion of such contribution allocated to the account(s) of a Participant) is within any applicable limit, including, but not limited to, the limits imposed by Code Sections 401(k) and (m), 402(g), 404 and 415. The contribution or transfer of any amount to the Trustee hereunder constitutes a certification by the Employer and the Plan Administrator that such contribution or transfer is in accordance with the Plan.

The Employer represents and warrants that either it has responsibility as a "Named Fiduciary" as defined in Section 402(a)(2) of ERISA or has properly delegated the responsibility to another Named Fiduciary, or the Plan names another such Named Fiduciary (other than the Trustee) to be responsible, for determining the correctness, amount and timing of contributions and for the collection of contributions.

The Employer or another Named Fiduciary, and not the Trustee, shall have all power over and responsibility for determining the correctness, amount and timing of contributions and for the collection of any contributions under or required by the Plan and the collection of loan repayments and any other amount required to be transferred or paid to the Trust by the Employer.

2.3     Accounts. The Trustee will maintain such accounts or funds as are necessary for the Trustee to carry out its responsibilities under the Trust; and the Trustee will make credits to or charges against such accounts or funds as provided therein. The Trustee will not maintain records of individual Participant accounts.

2.4    Distributions from Trust. The Trustee shall pay benefits, fees and/or dividends paid on Employer Securities, if any, from the Trust Fund only upon receipt of written direction from the Plan Administrator or its designee.

The Plan Administrator shall ensure that its designee provides direction to the Trustee based on the written direction it receives from the Plan Administrator or a third party administrator, if authorized by the Plan Administrator. The Trustee shall rely on directions from the Plan Administrator or its designee and shall be under no duty to ascertain whether the directions are in accordance with the Plan or applicable law.

In the event the Plan Administrator's designee is to provide direction to the Trustee, upon receipt of a written notice from the Plan Administrator or a third party administrator, if authorized by the Plan Administrator, certifying that an amount is payable to a Participant or other person under the Plan, the Plan's designee will give direction to the Trustee who will promptly pay such amount in accordance with the notice and will be fully protected in so doing. The Plan Administrator's notice will include all information necessary to enable the Plan's designee to direct the Trustee to make such payment, including income tax withholding instructions and the account or accounts or investment fund or funds to be charged with such payments. The Plan Administrator's giving of a payment notice constitutes a certification from the Plan Administrator to the Trustee and the Plan's designee that such payment is in accordance with the Plan, that the Plan Administrator has provided the Participant any and all notices and explanations required by law and that the Plan Administrator has properly obtained any waivers or consents of the Participant, the Participant's spouse or other distributee required by law. The Trustee will have no responsibility for the application of any payment by the recipient, for determining the rights or benefits of any person in the Trust or under the Plan, for the administration of the Plan, or for the adequacy of the Trust to meet all liabilities arising under the Plan. The Trustee shall have no responsibility for calculating or determining any amount to be distributed to a Participant and/or for compliance with any applicable requirements for distribution.

## ARTICLE III
## INVESTMENT DIRECTION

3.1    Directed Trustee. The Trustee shall act only as a directed Trustee and shall exercise no discretion over the investment or distribution of the Trust Fund. The Trustee shall invest and reinvest the Trust Fund, without distinction between principal and income, in accordance with investment directions, as provided in this Article. The Trustee will have no responsibility to review or question such instructions or directions and will have no responsibility or liability for compliance with any applicable requirements concerning Plan investments under the Plan or ERISA or for any loss or diminution in value which results from the choice of investments for the Trust Fund. Whenever the Trustee is permitted or required to act upon instructions or directions of the Recordkeeper, the Named Fiduciary, Plan Administrator, or Participant, the Trustee will have no responsibility or liability for any action taken or omitted by the Trustee in reliance thereon.

It is understood and agreed by the parties that although the Trustee will perform certain ministerial and custodial duties with respect to the assets held in Trust, such duties will be performed in the normal course by officers and other employees of the Trustee or by such other person or persons with whom the Trustee has contracted to perform services for it, all of whom may be unfamiliar with investment management, and that such duties will not include the exercise of any discretionary authority or other authority to manage and control assets comprising the Trust Fund.

3.2    Named Fiduciary-Investment Direction. The Trustee shall invest the Trust Fund pursuant to the written direction of the Plan's Named Fiduciary. Except with respect to Employer Securities, the Trustee is also authorized to take investment instructions from the Plan's designee, which the Plan shall cause to provide investment instructions to the Trustee based on the written directions it receives from the Plan's Named Fiduciary or the person authorized to act on behalf of the Named Fiduciary. The Trustee may assume that the authority of such person or persons continues unless the Trustee or the Plan's designee is otherwise notified in writing. The Trustee will not be liable for or in any way obligated to inquire into the acts or omissions of a Named Fiduciary or have any liability for following the instructions of the Recordkeeper.

If the Employer determines that the Plan is intended to comply with ERISA Section 404(c), the Employer is responsible for ensuring that the design and operation of the program satisfy the requirements of ERISA Section 404(c), so that no person who is otherwise a fiduciary will be liable under ERISA for any loss, or by reason of any breach, which results from such Participant's exercise of control. The Trustee will have no liability for investment performance of accounts where a Participant has control of the investments, without regard to whether the Participant has actually exercised control with respect to such accounts. If, notwithstanding the foregoing, Section 404(c) is not available with respect to any exercise of authority or control of a Participant or Beneficiary pursuant to this Section (whether by affirmative action or inaction), such Participant or Beneficiary shall be a Named Fiduciary with respect to such exercise of authority or control.

3.3    Employer Securities. Investments in Employer Securities (within the meaning of Section 407(d)(1)) are not permitted under the Trust, unless the Employer and the Trustee execute a separate agreement permitting such investment and setting forth the terms and conditions relating thereto.

3.4    Insurance and Annuity Contracts. The Trustee will sign certain insurance and annuity contracts ("Contracts") which fund options under the Plan as may be directed by the Employer. The responsibilities of the Trustee under the Contracts and under the terms of this Agreement will be to hold title to the Contracts as contract holder. As contract holder, the Trustee will, upon the written direction of the Employer, accept for addition to the Contracts and will execute in accordance with such direction any riders, endorsements or amendments to the Contracts as may be supplied to the Trustee by the Employer.

The Trustee will have no duties or responsibilities other than to be contract holder of the Contracts, and shall have no responsibility whatsoever to determine the adequacy, appropriateness or fairness of the Contracts or suitability thereof for the Plan or Plan participants, or to exercise any rights or options under the Contracts, except as set forth in this Agreement. Without limiting the foregoing, it is specifically agreed that:

(a) The Trustee will not be liable to the Employer or Plan Administrator or to any other person for any action or failure to take action by any issuer of Contracts.

(b) The Trustee will not be liable for the form, genuineness, validity, sufficiency or effect of the Contracts or for any act of any person or persons that may render the Contracts null and void.

(c) The Trustee will not be liable for any delay in any payment under a Contract resulting from any provision thereof or otherwise or for failure of payment (in whole or part) or other loss of options or rights should the Contracts lapse or otherwise become unenforceable for any reason whatsoever.

(d) The Trustee will have no responsibility in connection with the execution or approval of any document with respect to participation in the Contracts.

(e) The Employer shall cause all communications, riders, endorsements, amendments and notices with respect to the Contracts to be provided to the Named Fiduciary and not the Trustee. In the event the Trustee receives any such materials, it shall have no responsibility to forward the same or otherwise take any action with respect thereto.

3.5 Group Trusts.

(a) The Employer or Named Fiduciary, as applicable, shall be responsible for determining if the Plan is permitted by existing or future rulings of the United States Treasury Department to pool its funds in a "Group Trust."

(b) In the event that an investment alternative which the Named Fiduciary selects for the Plan is a Group Trust, the Named Fiduciary, by so selecting the Group Trust or other investment alternative, shall be deemed to have appointed the manager of the Group Trust as an investment manager of the Plan for purposes of Section 403(a)(2) of ERISA with respect to money and property allocated to the Investment Fund consisting of that Group Trust, and such investment manager may issue orders for the purchase or sale of securities directly to a broker-dealer. The Trustee shall be directed by the Named Fiduciary to execute any adoption agreements, ancillary trust agreements, custody agreements, or other documentation necessary to facilitate the Plan's investment in such a Group Trust.

(c) To the extent that any portion of the Trust Fund is invested in a Group Trust, the instruments governing that Group Trust and any ancillary trust or custody

agreement relating to the Trust Fund's investment therein is made a part of the Plan and is hereby incorporated by reference into this Agreement.

(d)     The Trustee will not be liable to the Employer or Plan Administrator or to any other person for any action or failure to take action by any issuer of a Group Trust.

(e)     The Trustee will not be liable for the form, genuineness, validity, sufficiency or effect of the Group Trust or for any act of any person or persons that may render the Group Trust null and void.

(f)     The Trustee will not be liable for any delay in any payment under a Group Trust resulting from any provision thereof or otherwise or for failure of payment (in whole or part) or other loss of options or rights should the Group Trust lapse or otherwise become unenforceable for any reason whatsoever.

(g)     The Trustee will have no responsibility in connection with the execution or approval of any document with respect to participation in the Group Trust.

(h)     The Employer shall cause all communications, riders, endorsements, amendments and notices with respect to the Group Trust to be provided to the Named Fiduciary and not the Trustee. In the event the Trustee receives any such materials, it shall have no responsibility to forward the same or otherwise take any action with respect thereto.

3.6     Short-Term Holdings Pending Instructions. In the event the Trustee fails to receive direction from the Plan's Named Fiduciary with respect to the investment of any cash contribution made to the Plan, the Trustee may hold such cash without liability for interest until such time as instructions are so received. The Trustee may also hold cash awaiting distribution from the Plan for a reasonable length of time without liability for interest.

ARTICLE IV
POWERS OF TRUSTEE

4.1     Directed Powers of the Trustee. The Trustee shall have the following powers and authority in the administration of the Trust; provided, however, that such powers and authority shall be exercised by the Trustee only upon the receipt of direction as provided in Article III:

(a)     to deal with all or any part of the Trust assets, including the power to acquire and dispose of assets;

(b)     to hold any part of the Trust Fund in cash for a reasonable time pending the investment or distribution thereof, without liability for interest;

(c)    to enforce by suit or otherwise, or to waive its rights on behalf of the Trust, and to defend claims asserted against it or the Trust; however, the Trustee will not be required to institute or defend itself, the Plan or the Trust in any court or administrative proceeding unless it has first been indemnified to its satisfaction for the costs and expenses thereof;

(d)    to compromise, adjust and settle any and all claims against or in favor of it or the Trust;

(e)    to vote, or give proxies to vote, any stock or other security, and to waive notice of meetings;

(f)    to oppose, or participate in and consent to the reorganization, merger, consolidation or readjustment of the finances or capitalization of any enterprise, to pay assessments and expenses in connection therewith, and to deposit securities under deposit agreements;

(g)    to invest or reinvest principal and income of the funds belonging to the Trust Fund in common or preferred stocks, mutual funds, bonds, or other securities, or limited partnership interests, or real or personal properties or interests therein, or any options, warrants or other instruments representing rights to receive, purchase, or subscribe for the same, or evidencing or representing any other rights or interests therein, or group annuity contracts which may include separate accounts issued by a legal reserve life insurance company authorized to do business in New York or to hold any reasonable amounts of such principal or income in cash;

(h)    to execute such deeds, leases, contracts, bills of sale, notes, proxies and other instruments in writing as shall be deemed requisite or desirable in the proper administration of the Trust Fund;

(i)    unless otherwise provided in the Plan, to cause all or any part of the money or other property of this Trust to be commingled with the money or other property of trusts created by others by causing such assets to be invested as part of any one or more collective investment funds or group trusts maintained by fiduciaries with respect to this Plan and Trust, including the Trustee, and the declaration of trust under which each such collective investment fund or group trust is established and maintained, as from time to time amended, is hereby made a part of this Trust to the same extent as if its terms were set out in full herein;

(j)    to sell for cash, to convert, redeem or exchange for other securities or other property, to tender securities pursuant to tender offers, or otherwise to dispose of any securities or other property at any time held by the Trustee;

(k)    to exercise any conversion privilege, subscription or other rights incident to property in the Trust and to make payments incidental thereto; and

(l)    to do all acts and things, not specified herein, which it deems advisable to carry out the Trust; and generally to exercise any of the powers of an owner with respect to all or any part of the Trust.

4.2    Discretionary Powers of the Trustee.  The Trustee shall have the following powers and authority in the administration of the Trust to be exercised in its sole discretion:

(a)    to register or cause to be registered any securities held by it hereunder in its own name or in the name of a nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity, to permit securities or other property to be held by or in the name of others, to hold any securities in bearer form and to deposit any securities or other property in a domestic depository, clearing corporation, or similar corporation; provided the requirements of Department of Labor Regulation 2550.404b-1 are met;

(b)    to make, execute, and deliver as Trustee hereunder, any and all instruments in writing necessary or proper for the accomplishment of any of the powers referred to in Section 4.1 or in this Section 4.2;

(c)    to employ suitable agents, advisers, and counsel and to pay their reasonable expenses and compensation as expenses of the Trust;

(d)    to contract with another person or persons, related or unrelated to the Trustee, to perform any of the Trustee's duties hereunder, including, but not limited to, Trust Fund recordkeeping, provided that, except as provided for under Section 6.1, the expenses and compensation of such person or persons shall be an expense of the Trustee, and not an expense of the Trust;

(e)    to bring, join in, or oppose any suits or legal proceedings involving the Trust where the Trustee may be adversely affected by the outcome, individually or as trustee, or where it is advised by counsel that such action is required on its part by ERISA or other applicable law, provided that the Trustee shall promptly give written notice to the Employer and offer the Employer the right to control any such action as long as such action has not been initiated by the Employer or any of its affiliates;

(f)    to receive all rents, issues, dividends, income, profits, and properties of every nature due the Trust Fund, and to hold or make distribution therefor in accordance with the terms of this Trust Agreement;

(g)    to take any action specifically committed to the Trustee's discretion by other provisions of this Agreement; and

(h)    generally to exercise such powers and to do such acts (exclusive of powers and acts involving investment management or otherwise committed to the discretion of a Named Fiduciary or any other party hereunder) whether or not expressly

authorized, which may be considered necessary or desirable by the Trustee for the protection of the Trust.

4.3    Delegation.  In the management of the Trust Fund, the Trustee may employ agents and delegate to them such ministerial and administrative duties as the Trustee shall see fit. As of the effective date of the Trust Agreement, the Trustee has appointed ADP, Inc. ("Recordkeeper") as the agent to which it has delegated certain nondiscretionary administrative and ministerial duties.  The Trustee and the Employer understand and agree that nothing in this Agreement, including the delegation of such nondiscretionary duties to the Recordkeeper, shall cause the Recordkeeper to be a fiduciary to the Plan.

4.4    Delivery and Custody of Funds and Securities.  All settlements of transactions may be carried out through a custodian appointed or consented to by the Employer (the "Custodian"), which Custodian may be a party other than the Trustee.

4.5    Voting.  The Employer shall cause all proxies, shareholder information calls for redemption, offer or exchange, subscription, reorganization or other proceedings affecting securities in the Trust Fund to be provided to the Named Fiduciary and not the Trustee.  In the event the Trustee receives any such materials, it shall have no responsibility to forward the same or otherwise take any action with respect thereto.

## ARTICLE V
## ACCOUNTINGS

5.1    Valuation and Reports

(a)    The Trustee will keep full accounts of all its receipts, disbursements and other transactions hereunder, and, annually, will determine the fair market value of the assets of the Trust as of the last day of the Plan Year.  (If any Plan Year is less than a 12-month period, the Trustee shall make the same valuation as of the last day of said short Plan Year.)  For purposes of such accounts, the fiscal year of the Trust will coincide with the Plan Year.  Within a reasonable time after the end of the Plan Year, or within a reasonable time after its removal or resignation, or the termination of the Trust, the Trustee will render to the Plan Administrator an account of the Trust since the last previous such accounting.

(b)    With the consent of the Trustee, the Plan Administrator or Employer may establish other valuation dates, and the Trustee will render to the Plan Administrator an account of the value of the Trust assets as of the current valuation date and, if requested, of its transactions hereunder since the preceding valuation date.

(c)    The Trustee's records pertaining to the Trust Fund as to each Plan shall be open to inspection, copying and audits at reasonable times by the Plan Administrator and/or its designee.  No person other than the Plan Administrator will have the right to demand or receive any report or account from the Trustee.  In any

proceeding for a judicial settlement of any account or for instructions, the only necessary parties will be the Trustee, the Trustee's designee, the Plan Administrator and the Plan's named designee.

5.2    Approval of Account.   To the extent permissible under applicable law, the written approval of any account by the Plan Administrator will be final and binding upon the Employer, the Participants and all persons who then are or thereafter become interested in the Trust, as to all matters and transactions stated or shown therein. The failure of the Plan Administrator to notify the Trustee or its duly appointed agent within 60 days after the Trustee's sending of any account to the Employer of the Plan Administrator's objections (if any) to the account will be the equivalent of written approval. If the Plan Administrator files any objections within such 60 day period with respect to any matters or transactions stated or shown in the account and the Plan Administrator and the Trustee cannot resolve the questions raised by such objections, the Trustee will have the right to have such questions settled by judicial proceedings. Nothing herein will deprive the Trustee of the right to have a judicial settlement of its accounts.

<div align="center">

ARTICLE VI
COMPENSATION, FEES AND TAXES
</div>

6.1    Trustee Compensation.(a)     Although the Trustee reserves the right to impose and/or amend a fee schedule upon the giving of 90 days' advance written notice to the Employer, no separate fee schedule will be affixed to this Agreement as of the date of this Agreement. Notwithstanding the foregoing, the Employer acknowledges the following:

The Recordkeeper compensates the Trustee to provide services as set forth in this Agreement to retirement plans also receiving services from the Recordkeeper. By compensating the Trustee, the Recordkeeper has not engaged the Trustee on the Employer's behalf, has no responsibility to monitor the performance of the Trustee, and is not obligated to perform any service provided under this Agreement other than as contemplated under Section 4.2. The Recordkeeper may charge fees under its recordkeeping services agreement with the Employer with respect to some or all of the services contemplated under this Agreement, and may modify such fees in accordance with the terms of such recordkeeping agreement, and the Recordkeeper may terminate its agreement to compensate the Trustee for services under this Agreement, and in that event, the Trustee may impose and/or amend its fee schedule as provided herein.

(b)     The Employer acknowledges that as part of the Trustee's compensation, the Trustee may earn interest on balances, including without limitation disbursement balances and balances arising from purchase and sale transactions. If the Trustee advances cash or securities for any purpose, including the purchase and sale of foreign exchange or of contracts for foreign exchange, or in the event that the Trustee shall incur or be assessed taxes, interest, charges, expenses, assessments,

or other liabilities in connection with the performance of this Agreement, except such as may arise from its own negligent action, negligent failure to act or willful misconduct, any property at any time held for the Trust Fund shall be security therefor and the Trustee shall be entitled to collect from the Trust Fund sufficient cash for reimbursement, and if such cash is insufficient, dispose of the assets of the Trust Fund to the extent necessary to obtain reimbursement. If the Recordkeeper provides disbursement services hereunder, the Employer hereby authorizes the Recordkeeper to retain income or interest on disbursement balances in lieu of the Trustee. To the extent the Trustee advances funds to the Trust for disbursements or to effect the settlement of purchase transactions, the Trustee shall be entitled to collect from the Trust Fund either (i) with respect to domestic assets, an amount equal to what would have been earned on the sums advanced (an amount approximating the "federal funds" interest rate), or (ii) with respect to non-domestic assets, the rate applicable to the appropriate foreign market.

6.2   Fees. All fees and expenses actually and properly incurred in the administration of the Trust Fund shall be paid from the assets of the Trust Fund, unless paid by the Employer.

6.3   Method of Payment. In order to provide for payment of any fees and expenses not paid directly by the Employer as provided in Section 6.2, the Trustee in its discretion may partially or fully liquidate any asset in the Trust Fund and shall not be liable for any loss occasioned thereby. Any compensation of the Trustee which is not paid from the Trust for whatever reason will be the responsibility of the Employer. Any payment out of the Trust Fund of any of the fees authorized in this Article VI shall be deemed to be for defraying the reasonable expenses of administering the Plan.

6.4   Taxes.

(a)   All real and personal property taxes, income taxes and other taxes of any and all kinds whatsoever upon or in respect of the Trust Fund hereby created or any money, income or property forming a part thereof, shall be paid directly from the assets of the Trust Fund following advance written notice to the Employer.

(b)   The Trustee may assume that any taxes assessed on or in respect of the Trust Fund are lawfully assessed unless the Plan Administrator or the Employer shall in writing advise the Trustee that in the opinion of counsel for the Employer such taxes are not lawfully assessed. In the event that the Plan Administrator or the Employer shall so advise the Trustee, the Trustee, if so requested by the Plan Administrator and suitable provision for indemnity of the Trustee having been made, shall contest the validity of such taxes in any manner deemed appropriate by the Plan Administrator, the Employer or counsel for the Employer. The word "taxes" in this Section 6.4 shall be deemed to include any interest or penalties that may be levied or imposed in respect to any taxes assessed.

(c)   In order to provide for payment of any taxes as provided in Section 6.4, the Trustee in its discretion may partially or fully liquidate any asset in the Trust

Fund and shall not be liable for any loss occasioned thereby. Any payment out of the Trust Fund of any taxes authorized in this Article VI shall be deemed to be for defraying the reasonable expenses of administering the Plan.

## ARTICLE VII
## RESIGNATION

7.1     Resignation or Removal of Trustee.

(a)     The Trustee may resign at any time by giving at least 90 days' written notice to the Employer, and the Employer may remove the Trustee at any time by giving at least 90 days' written notice to the Trustee; in either case, the notice period may be reduced to such shorter period as the Trustee and the Employer agree upon. The Trustee's removal or resignation will be effective upon the last day of the notice period or, if later, the acceptance of the Trust by a successor trustee. Until the effective date of the appointment of a successor trustee, the Trustee will have full authority and responsibility to act as Trustee hereunder.

(b)     When the Trustee's resignation or removal becomes effective, the Trustee will perform all acts necessary to transfer the assets of the Trust to its successor. However, the Trustee may reserve such portion of the trust assets as it may reasonably determine to be necessary for payment of its fees, if any, and any taxes and expenses; any balance of such reserve remaining after payment of such fees, taxes and expenses will be paid over to its successor.

(c)     Resignation or removal of the Trustee will not terminate the Trust. In the event of any vacancy in the position of Trustee, whether by the resignation or removal of the Trustee or otherwise, the Employer will appoint a successor trustee and such appointment will become effective upon the acceptance of its office by the successor trustee. If the Employer does not appoint such a successor within 90 days after notice of resignation or removal or other vacancy in the office of trustee is given, the Trustee may apply to a court of competent jurisdiction for such appointment. Each successor trustee so appointed and accepting a trusteeship hereunder will have all of the rights and powers and all of the duties and obligations of the original trustee under the provisions hereof. However, the Trustee may reserve such portion of the Trust assets as it may reasonably determine to be necessary for payment of its fees, if any, and any taxes and expenses; any balance of such reserve remaining after payment of such fees, taxes and expenses will be paid over to its successor. The Trustee may require evidence satisfactory to it that a successor trustee has been appointed prior to transferring assets of the Plan to any successor.

(d)     Trustee will not be liable or responsible for anything done or omitted to be done in the administration of the Trust before it became Trustee or after it ceases to be Trustee.

99-2281-0710                                            13

ARTICLE VIII
PROTECTION/LIMITATION ON LIABILITY FOR TRUSTEE

8.1    Trustee's Protection.  The Trustee shall have no duty to take any action other than as
herein specified, unless the Recordkeeper, the Plan Administrator, the Employer or the
Named Fiduciary shall furnish it with instructions in proper form and such instructions
shall have been specifically agreed to by it, or to defend or engage in any suit unless it
shall have first agreed in writing to do so and shall have been fully indemnified to its
satisfaction.

8.2    Reliance by Trustee.

(a)    The Trustee may rely upon any decision of the Plan Administrator, the Employer
or the Named Fiduciary purporting to be made pursuant to the terms of the Plan,
and upon any information, statements, certifications or directions submitted by
the Recordkeeper, the Plan Administrator, the Employer or the Named Fiduciary
(including statements concerning the entitlement of any Participant to benefits
under the Plan or directions to make payments), and will not be bound to inquire
as to the basis of any such decision or information or statements, and will incur no
obligation or liability for any action taken or omitted by the Trustee in reliance
thereon.

(b)    Whenever the Trustee is permitted or required to act upon the instructions or
directions of the Recordkeeper, the Plan Administrator, the Employer or the
Named Fiduciary, the Trustee will be fully protected in not acting in the absence
hereof.

(c)    The Trustee may conclusively rely upon and shall be protected in acting in good
faith upon any written representation or order from the Recordkeeper, the Plan
Administrator, the Employer or the Named Fiduciary or any other notice, request,
consent, certificate or instrument or paper believed by the Trustee to be genuine
and properly executed, or any instrument or paper if the Trustee believes the
signature thereon to be genuine.

(d)    The Trustee may consult with legal counsel (who may or may not be counsel for
the Employer) concerning any questions which may arise with respect to its rights
and duties hereunder, and the advice of such counsel will be full and complete
protection in respect of any action taken or omitted by the Trustee hereunder in
good faith and in accordance with the advice of such counsel.

8.3    Absence of Instructions.   If the Trustee receives no instructions from the Recordkeeper,
the Plan Administrator, the Employer or the Named Fiduciary in response to
communications sent by the Trustee to the Recordkeeper on behalf of the Plan
Administrator, the Employer or the Named Fiduciary, or to the Plan Administrator, the
Employer, the Plan Administrator or the Named Fiduciary at the last known address as
shown on the books of the Trustee, the Trustee may make such determination with
respect to distributions and other administrative matters arising under the Plan as it

considers reasonable. Any determinations so made will be binding on all persons having or claiming any interest under the Plan or Trust, and the Trustee will incur no obligation or responsibility for any such determination made in good faith or for any action taken pursuant thereof.

8.4    Indemnification by the Employer and Plan Administrator.

    (a)    The Employer shall indemnify and hold harmless the Trustee and its officers, directors, employees, shareholders, delegates and agents (the "Indemnitees") from and against any losses, costs, damages or expenses, including reasonable attorneys' fees and expenses, which the Indemnitees may incur or pay out by reason of (i) the Indemnitees acting in accordance with the directions of the Recordkeeper, the Plan Administrator, the Employer or the Named Fiduciary or failing to act in the absence of such certification or other information provided by the Recordkeeper, the Plan Administrator, the Employer or the Named Fiduciary; (ii) the Trustee's exercise and performance of its powers and duties hereunder, unless the same are determined to be due to the Trustee's gross negligence, bad faith, willful misconduct, or breach of this Agreement or applicable law; or (iii) any (alleged or actual) action or inaction on the part of the Recordkeeper, the Plan Administrator, the Employer or the Named Fiduciary, unless such losses, costs, damages or expenses arise out of the Trustee's gross negligence, bad faith, willful misconduct, or breach of this Agreement or applicable law.

    (b)    In addition, regardless of whether the Plan meets the requirements of Section 404(c) of ERISA, and regulations thereunder, if the Participant controls the investment of his or her account, the Employer shall indemnify and hold harmless the Indemnitees from and against any losses, costs, damages or expenses, including reasonable attorneys' fees and expenses, which the Indemnitees may incur or pay out by reason of the Indemnitees' acting in accordance with the Recordkeeper's or a Participant's directions or failing to act in the absence of such directions or acting or failing to act in reliance on the Recordkeeper's or a Participant's instructions correctly or incorrectly conveyed by the Recordkeeper or the Plan Administrator.

    (c)    The Employer further agrees to indemnify and hold harmless the Indemnitees for any losses, costs, damages or expenses, including reasonable attorneys' fees and expenses, which the Indemnitees may incur or pay out by reason of any (alleged or actual) action or inaction on the part of any predecessor or successor trustee of the Trust or by reason of any claims asserted against the Indemnitees or any thereof alleging failure of the Trustee to assert claims against any predecessor or successor trustee of the Trust.

8.5    Force Majeure. Notwithstanding anything in this Agreement to the contrary, the Trustee (including any delegate of the Trustee) shall not be responsible or liable for its failure to perform under this Agreement or for any losses to the Trust Fund resulting from any event beyond the reasonable control of the Trustee, its delegates, agents or subcustodians, including but not limited to nationalization, strikes, expropriation, devaluation, seizure,

or similar action by any governmental authority, de facto or de jure; or enactment, promulgation, imposition or enforcement by any such governmental authority of currency restrictions, exchange controls, levies or other charges affecting the Trust Fund's property; or the breakdown, failure or malfunction of any utilities or telecommunications systems; or any order or regulation of any banking or securities industry authority or regulator including changes in market rules and market conditions affecting the execution or settlement of transactions; or acts of war, terrorism, insurrection or revolution; or acts of God; or any other similar or third-party event. This Section shall survive the termination of this Agreement.

## ARTICLE IX
## PROHIBITION OF DIVERSION

9.1     Prohibition of Diversion.

(a)     Except as provided in subparagraph (b) hereof, at no time prior to the satisfaction of all liabilities with respect to Participants and their successor in interest under the Plan shall any part of the corpus or income of the Trust Fund be used for, or diverted to, purposes other than for the exclusive benefit of Participants or their successors in interest or for defraying reasonable expenses of administering the Plan.

(b)     The provisions of subparagraph (a) notwithstanding, contributions made by the Employer under the Plan shall be returned to the Employer under the following conditions:

(i)     if a contribution to the Plan (other than a multi-employer Plan) is made by mistake of fact, such contribution shall be returned to the Employer within one year of the payment of such contribution; and

(ii)    contributions to the Plan are specifically conditioned upon their deductibility under the Internal Revenue Code. To the extent a deduction is disallowed for any such contribution, it shall be returned to the Employer within one year after the disallowance of the deduction. Contributions which are not deductible in the taxable year in which made but are deductible in subsequent taxable years shall not be considered to be disallowed for purposes of this subsection.

Any return of contributions by the Trustee pursuant to this Section shall be made only upon the direction of the Employer, which shall have exclusive responsibility for determining whether the conditions of such return have been satisfied and for the amount to be returned.

## ARTICLE X
## AMENDMENT AND TERMINATION OF THE TRUST

10.1 Amendment.  The Trustee may at any time and from time to time amend any or all provisions of this Agreement.  A copy of any such amendment will be delivered to the Employer and the Recordkeeper at least 90 days before the effective date of such amendment (or such shorter notice period to which the Trustee, the Employer and the Recordkeeper agree), provided that, to the extent necessary to retain the Plan's tax qualification, any amendment may take effect retroactively.  No amendment or termination will cause this Agreement to be inconsistent with the provisions of the Plan or ERISA.  Any such amendment may be retroactive if necessary or appropriate to qualify or maintain the Trust as a part of a plan and trust exempt from Federal income tax under Sections 401(a) and 501(a) of the Code, the provisions of ERISA, or other applicable law.  Notwithstanding the foregoing, no amendment shall increase the duties or liabilities of the Trustee without the Trustee's consent; and, provided further, that no amendment shall divert any part of the Trust Fund to any purpose other than providing benefits to Participants and their successors in interest or defraying reasonable expenses of administering the Plan.

10.2 Termination.  If the Plan is terminated in whole or in part, the Trustee shall distribute the Trust Fund or any part thereof in such manner and at such times as the Plan Administrator or its designee shall direct in writing.  The Trust created hereunder will terminate upon the distribution or application of all the assets of the Trust Fund.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1 Relationship to Plan.  Unless the context of this Agreement clearly indicates otherwise, the terms defined in the Plan shall, when used herein, have the same meaning as in the Plan.

11.2 Nonalienation.  Except as otherwise required in the case of any qualified domestic relations order within the meaning of Section 414(p) of the Code, a federal tax levy made in accordance with Section 6331 of the Code, or as otherwise required under applicable law, the benefits or proceeds of any allocated or unallocated portion of the assets of the Trust Fund and any interest of any Participant or beneficiary arising out of or created by the Plan either before or after the Participant's retirement shall not be subject to execution, attachment, garnishment or other legal or judicial process whatsoever by any person, whether creditor or otherwise, claiming against such Participant or successor in interest.  No Participant or successor in interest shall have the right to alienate, encumber or assign any of the payments or proceeds or any other interest arising out of or created by the Plan and any action purporting to do so shall be void.  The provisions of this Section shall apply to all Participants and successors in interest regardless of their citizenship or place of residence.

11.3    Certification of Trust Agreement.  Any person dealing with the Trustee may rely upon a copy of this Agreement and any amendments thereto certified to be true and correct by the Trustee.

11.4    Not a Party to Trust.  This Agreement may be executed by the Recordkeeper on behalf of the Trustee in its capacity as Trustee's agent solely for that limited purpose.  Employer acknowledges that the Recordkeeper shall only execute this Agreement in order to create a binding trust instrument on behalf of the Trustee.  By executing this Agreement as agent of the Trustee, the Recordkeeper shall not be deemed to be a party hereto, be considered to have selected or to be responsible for monitoring the performance of the Trustee on the Employer's behalf, nor be responsible for the Trustee's performance of any of its obligations hereunder.

11.5    Governing Law.  The construction, validity and administration of this Agreement shall be governed by the laws of the State of Georgia, except to the extent that such laws have been specifically superseded by ERISA.

11.6    Definition of Employer.  As used in the Agreement, "Employer" means: (i) the employer specified in the Agreement and, as the context may require (ii) any other entity maintaining the Plan that is required to be aggregated with such employer under Code Sections 414 (b), (c), (m), or (o) and which has authorized such employer to act on its behalf for purposes of this Agreement.  The term "Employer" shall include other adopting employers under the Plan, to the extent not inconsistent with the terms of the Plan.

11.7    Titles.   The titles to sections of this Trust Agreement are placed herein for convenience of reference only, and the Trust Agreement is not to be construed by reference thereto.

11.8    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which together shall constitute but one instrument, which may sufficiently be evidenced by any counterpart.

11.9    Severability.  If any provision of this Trust Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions thereof, and this Trust Agreement shall be construed and enforced as if such provisions had not been included.

11.10   Notices.  Any written notice, demand, direction, or instruction given to the parties to this Agreement shall be duly given if mailed or delivered:

(a)    to the Trustee, at Reliance Trust Company, 1100 Abernathy Road, 500 Northpark, Suite 400, Atlanta, GA 30328 Attention to: General Counsel, Ronald D. Stallings or any other address as shall be specified by the Trustee in writing; and

(b)    to the Employer, at the address indicated on the signature page hereto, or if the Recordkeeper agrees to accept such notice on behalf of the Employer, to the Recordkeeper at the last address in the Trustee's files for the Recordkeeper.

A copy of any written notice, demand, direction, or instruction between the parties to the Agreement shall be sent to the Recordkeeper at the address provided for such notice in the service agreement between the Recordkeeper and the Employer.

To the extent permitted by applicable law, the Trustee may provide notices or make available information to the Employer and/or Plan participants in connection with the operation of the Plan through electronic means.

11.11   No Third Party Beneficiaries.  The provisions of this Agreement are intended to benefit only the parties hereto, their respective successors and assigns, and participants and their beneficiaries under the Plan.  There are no other third party beneficiaries.

11.12   Authority and Role of Employer.

By executing this Agreement, the Employer executing this Agreement represents that (i) it has the authority to bind all Employers that maintain this Plan ("Participating Employers") to this Agreement, (ii) the Plan Administrator and/or the Employer (or their respective designees) are the designated representatives of all Participating Employers and (iii) the Employer and all Participating Employers have taken all necessary action for the appointment of the Trustee as such, and that this Trust Agreement constitutes a legal, valid and binding obligation of the Employer.

IN WITNESS WHEREOF, this Agreement has been executed on behalf of the parties hereto, all on the day and year first above written.

EMPLOYER:                                      TRUSTEE:

Synergy Brands Inc.
                                               **RELIANCE TRUST COMPANY**

*Mitchell Gerstein*
_____                      _____
Signature                                      Signature

 Mitchell Gerstein                              Sharon H. Ennis
_____                      _____
Print Name                                     Print Name

 CEO                                            Senior Vice President
_____                      _____
Title                                          Title

Employer Address:
 223 Underhill Blvd
_____

_____
Syosset, NY  11791

::ODMA\PCDOCS\PGDocs\6078699\4

.

The following page contains a Summary of Material Modifications (SMM) for your plan describing the change in Trustee.

Instructions:
1. Print the SMM
2. Distribute the SMM to all currently-eligible employees and Plan participants (including terminated, vested participants) with an account balance, as well as to alternate payees and beneficiaries with an account balance under the Plan.
3. Distribute the SMM with your current Summary Plan Description to employees as they become eligible to participate in your Plan.

SM 2010 RTC SMM

SUMMARY OF MATERIAL MODIFICATIONS
for the

Synergy Brands Inc. 401(k) Profit Sharing Plan
(Name of Plan)

(1)    *General.* This is a Summary of Material Modifications regarding our Company's retirement savings plan (the "Plan"). This Summary of Material Modifications supplements the Summary Plan Description ("SPD") previously provided to you. You should retain this document with your copy of the SPD.

(2)    *Summary Description of Modification.* Below is a summary of certain modifications made to our Plan. These modifications are effective as of the dates indicated.

The section of your SPD entitled "Miscellaneous Items" is amended as follows:

Change in Plan's Trustee:

Effective November 19 , 2010 , the Plan's trustee has changed from JPMorgan Chase Bank, N.A to **Reliance Trust Company**.

The new address of the Plan's Trustee is:

Reliance Trust Company
1100 Abernathy Road
500 Northpark, Suite 400
Atlanta, GA 30328

SM 2010 RTC SMM

Plan Starter Kit

ADP Prototype Plan — Annex A
Administrative Services Agreement

Client Name _____

This Agreement sets forth an agreement between the above-named Client and ADP by which ADP will provide administrative services (the "Services"), as described in this Agreement and in Chapter 1 of the Administration Manual, to Client, in connection with Client's sponsorship of a plan in the form of the Automatic Data Processing Prototype 401(k) and Profit Sharing Plan (the "Plan"). In performing the Services, ADP may act through an affiliate or division, as ADP deems appropriate or necessary in light of applicable regulatory requirements, and references to ADP in this Agreement (expressly including, but not by way of limitation, Sections 8, 13 and 14 of this Agreement) shall be interpreted accordingly. In addition to describing the Services in Chapter 1, the Administration Manual provided by ADP to Client contains certain key administrative rules for the administration of the Plan by Client in its remaining Chapters (collectively the "Administration Manual"). The Administration Manual may be amended from time to time as ADP may reasonably determine is required and appropriate. The Plan shall be administered in accordance with its terms and the terms of the Administration Manual. Client and/or Client's Administrative Committee may not adopt rules or procedures that conflict with the Administration Manual, or that are incompatible or inconsistent with ADP's operational systems and framework. Any service that ADP agrees to provide with respect to the Plan, whether or not specified in the Administration Manual or specifically described hereunder, is subject to the terms of this Agreement. Unless otherwise specifically indicated herein, all terms used in this Agreement shall have the same meaning as when used in the Plan.

Client and ADP agree as follows:

1. **TERMS OF AGREEMENT**

   A. The Effective Date of this Agreement is the later of (i) the date the Agreement is executed by a duly authorized representative of ADP and (ii) the date the installation fee has been received by same.

   B. This Agreement will continue in effect until the earlier of (i) the date Client completes the termination of the Plan or merges the Plan in its entirety into another plan, (ii) the date Client leaves the prototype program sponsored by Automatic Data Processing Federal Credit Union or any successor sponsor thereof (the "Sponsor"), (iii) the date the Sponsor abandons the Plan, or (iv) the date this Agreement is terminated by ADP in accordance with the provisions of this Agreement. Notwithstanding the foregoing, either Client or ADP may terminate this Agreement upon 60 days prior notice to the other party. Sections 3A, 3G, 3H, 7D, 9A, 9E, 9F, 10, 11, 12, 13 and 14 shall survive the termination of this Agreement.

   C. Both Client and ADP acknowledge and agree that continuing obligations under this Agreement, including, but not limited to those obligations relating to indemnification and confidentiality, shall survive the termination of this Agreement.

   D. Any references to days hereunder shall mean business days, i.e., days on which the New York Stock Exchange is open.

2. **THE RECORDKEEPING AND ADMINISTRATIVE SERVICES; AUTHORIZATION TO RECEIVE AND TRANSMIT INSTRUCTIONS**

   Subject to the terms and conditions of this Agreement, ADP agrees to provide Client with any and all of the Services covered by this Agreement which Client may, from time to time during the term of this Agreement, request ADP provide to it. By execution of this Agreement, Client authorizes ADP to receive and transmit instructions on behalf of the Plan and its participants to the trustee of the Plan ("Trustee"), any investment fund managers, any transfer agent, bank or broker-dealer as are necessary or appropriate in connection with the performance of Services hereunder by ADP. Any such person may rely conclusively on

a copy of this Agreement as proof of the authority of ADP to receive and transmit such instructions in accordance with this Agreement and the Administration Manual unless and until notified otherwise by Client in writing. ADP shall not be obligated to follow or implement any instruction or direction of Client that is inconsistent or incompatible with its operational procedures and framework.

3. **FEES AND EXPENSES PAYABLE BY CLIENT OR THE TRUST**

   A. Unless otherwise indicated on the Price Schedule, Client will pay to ADP all fees specified therein (as well as any amount specified in Section 4A). Client agrees to pay ADP for the Services not specifically covered by the Price Schedule at ADP's then prevailing prices for such Services. In the event Client fails to remit such fees or amounts within ten (10) days from the date of invoice for any reason (including, but not limited to, bankruptcy or Plan termination), ADP reserves the right and shall have been deemed to have been directed by Client, without additional notice, to charge the same against the Plan Trust, in a reasonable and consistent manner. In such instances, Client will be notified by ADP that the Plan Trust has been charged and that Client will be liable for any and all expenses ADP may incur, including interest to the maximum allowed by law, and reasonable attorney fees, in taking action to collect any amounts due ADP hereunder.

   B. Client acknowledges that ADP receives as additional compensation certain fees from one or more of the investment funds to be made available for the investment of assets under the Plan ("Investment Funds"), or from the affiliates or agents of such funds for services provided by ADP with respect to such Investment Funds, and that such fees reduce the amount of fees that would otherwise be payable pursuant to the Price Schedule. By executing this Agreement, Client authorizes the payment of such fees to ADP. Information about such fees may be obtained by written request to ADP.

   C. Between the time when amounts contributed by Client pursuant to the terms of the Plan are impounded by ADP and the time when it is determined that it is administratively feasible to transfer the funds to the Trustee, any income earned on the impounded funds shall be for the benefit, and the sole property of, and additional compensation to, ADP.

   D. After the expiration of the six (6) month period beginning on the date this Agreement is accepted by Client, ADP retains the right to amend the Price Schedule prospectively upon thirty (30) days' written notice to Client provided such increase is part of a general price change by ADP to its clients who participate in the particular ADP prototype plan program in which Client participates for affected items affected by the price change.

   E. Effective with Client's execution of this Agreement, the one-time plan installation fee is due and payable. Unless other terms are negotiated by Client with ADP, ADP will not commence work until an executed copy of this Agreement is received and the plan installation fee is paid in full. Should ADP, in its discretion, commence Services on behalf of Client prior to the Effective Date, Client will pay to ADP all fees and expenses as are specified herein and the terms of this Agreement shall apply to the provision of such services. ADP will charge an additional installation fee if other plans and/or assets, as approved by ADP, are merged into the Plan. The additional fee will be determined after receipt of all relevant data.

   F. Client specifically acknowledges and agrees that the fees and expenses as itemized in this Agreement are based upon Client's



compliance with all practices and procedures set forth and described in any written directions (including, but not limited to, the Administration Manual) provided by ADP. To the extent Client deviates from such practices and procedures, Client will be responsible for additional fees payable to ADP as determined by ADP at an hourly rate. In addition to the charge described in the preceding sentence, ADP shall charge Client a fee for processing the recall of an "ACH transaction" by Client's bank as described in Section 4.B below at ADP's then prevailing fee for such processing.

G. There shall be added to all payments hereunder amounts equal to any applicable taxes levied or based on this Agreement or the Services provided hereunder, exclusive of taxes based on ADP's net income.

H. ADP is hereby directed to charge fees for processing the following transactions directly to the account of each participant engaging in any such transaction: in-service withdrawals, loans and distributions upon termination of participation in the Plan (collectively, "Participant Transactions"). Client further directs that such fees shall be liquidated pro-rata from the Investment Funds in which the participant's account is invested at the time that the fees are processed (exclusive of Self-directed Accounts, as defined in Section 8C), and that such fees shall reduce the proceeds of the Participant Transaction requested. Client acknowledges that ADP has disclosed to it the current amount of the fees for Participant Transactions. Client directs that if the amount of such fee change in the future, this authorization shall remain in effect (provided that ADP has provided notice of any such fee changes as is required under this Agreement) unless prior to the effective date of such fee change, the Client has notified ADP that it may no longer charge such fees directly to participants' accounts and that Client shall be invoiced for such fees.

I. Client may direct the Trustee to pay charges not described in Section 3H above, including charges other than those set forth in the Price Schedule, from the Plan Trust; provided that prior to first giving any such direction Client notifies ADP and receives the consent of ADP to such direction. Client hereby directs that any administrative fees charged by ADP and the Trustee, other than Participant Transaction Fees described in Section 3G, that it authorizes to be paid from the assets of the Plan Trust shall be allocated pro-rata amongst the account balances of all participants in the Plan based on the ratio of each participant's account balance to the aggregate of all participants' account balances under the Plan. Client further directs that such fees shall be liquidated pro-rata from the Investment Funds in which the participant's account is invested at the time that the fees are processed (exclusive of Self-Directed Accounts, as defined in section 8C).

4. **AUTHORIZATION OF CLIENT'S BANK**

A. Client agrees to deposit sufficient good funds each payroll period in its designated Demand Deposit Account to cover the Participant Contributions (including loan repayments) and Employer Contributions, if applicable, to be made for the payroll period. Subject to the conditions contained in this Section 4, ADP shall initiate the debit of funds from Client's Demand Deposit Account pursuant to an Automated Clearing House ("ACH") transaction. ADP agrees to transmit the amount of such contributions to the Trust. In order to enable ADP to transmit the applicable Participant and/or Employer Contributions to the Plan Trust and to receive certain of the other Services offered by ADP from time to time, Client agrees to execute certain additional documents (including, without limitation, a Client Account Agreement authorizing ADP to initiate the necessary transfers from Client's designated Demand Deposit Account).

B. If ADP receives notice from Client's bank (a "Bank Notice") that insufficient good funds are available in the Demand Deposit Account to satisfy any ACH debit described in Section 4A, Client

hereby authorizes ADP to take such actions as are necessary to redeem shares of Investment Funds within the Trust in order to effectuate the recall of the debited funds by Client's bank. Such redemption generally shall occur no later than five business days following the date of ADP's receipt of a Bank Notice. ADP may, but is not required to, contact Client prior to effectuating such redemption to request that the Client deposit sufficient funds in its Demand Deposit Account so that ADP may initiate another debit for the originally debited amount.

C. If insufficient good funds are deposited in Client's Demand Deposit Account to satisfy any debit, prior to any subsequent debit of Client's Demand Deposit Account, ADP may provide notice to Client that henceforth, new administrative procedures, which shall be communicated to the Client, will be instituted to attempt to reduce the risk of insufficient funds being available for any future debit. Alternatively, ADP may elect to avail itself of any other right accorded to it under this Agreement, including providing notice of termination of the Agreement in accordance with Section 1.

5. **COMMUNICATION LINES**

It is understood and agreed that Client shall be exclusively responsible for and shall pay all installation, monthly and other charges relating to the installation and use of communications lines, if any, in connection with the Services. ADP shall not be responsible for the reliability or continued availability of any communications lines used by Client in accessing the Services.

6. **CONVERSION TO THE SERVICES**

ADP shall, to the extent applicable, convert the applicable Client files, databases and other information necessary for Client to use the Services (the "Client Files") to the ADP system within a reasonable period of time. Client agrees to cooperate with ADP and to provide ADP with all necessary information and assistance required by ADP to successfully convert Client Files. Client will assign a liaison person to assist and cooperate with ADP in such conversion. ADP shall, to the extent applicable, determine in accordance with its normal acceptance procedures when the applicable Client Files have been successfully converted and when the Services selected by Client are operational and available for Client's use.

Plans with existing assets are subject to a transition period called the Reconciliation Period. During the Reconciliation Period, Participant records are transferred from the prior recordkeeper to ADP and plan assets are transferred from the prior trustee to Trustee, which transfer may involve the physical transfer of assets from one investment manager to another investment manager. All prior plan assets must be liquidated and wired to Trustee as of a conversion date, unless the assets already reside at Trustee; provided, however, that if the assets already reside at Trustee, it may be necessary to physically transfer assets from one investment manager to another investment manager. The duration of the Reconciliation Period will extend from the point that the assets are initially received by Trustee (the "Conversion Date") through the date that all records are received by ADP completely and accurately in a format acceptable to ADP, reconciled to prior plan assets and established on the ADP Recordkeeping System. Client is responsible for ensuring that the prior recordkeeper perform a final valuation through the conversion date and, if later, the date that assets are moved to Trustee and that all required Participant account and census information, as well as any other required plan material pursuant to the implementation guidelines (e.g., the current plan document), is transmitted completely and accurately in an acceptable format to ADP. Contribution deposits will be invested directly into the participant designated Investment Funds and loan repayment deposits, if applicable, will be temporarily suspended, pending establishment of the loan records on the ADP Recordkeeping System. ADP cannot and will not guarantee the duration of the Reconciliation Period. Prior plan assets will be invested in a short-term interest-bearing account during the Reconciliation Period, unless

another arrangement is pre-approved by ADP and agreed to in writing between Client and ADP.

During the Reconciliation Period, Participants may not request withdrawals, distributions or loans from the Plan nor request investment changes among the Plan Investment Funds (that is, a "Blackout Period" on these transactions will occur). In addition, the Plan's prior recordkeeper may impose a Blackout Period on one or more types of transactions ordinarily engaged in by Plan Participants and beneficiaries in connection with the planned conversion of Client's Plan from its prior recordkeeper to ADP. Client acknowledges that it has been informed by ADP (A) of Client's or its designated Plan administrator's obligation to provide advance notice to affected Participants and beneficiaries of the foregoing blackout on transactions, including all content required to be included in such notice under regulations issued by the United States Department of Labor ("DOL") and (B) that if Client or its designated Plan administrator fails to comply with the advance notice requirement, the DOL can assess a maximum penalty of up to $100 per day per each affected Participant or beneficiary from the date that Client or its designated Plan administrator initially fails to provide the notice through the date that the blackout actually ends. Client or its designated Plan administrator will provide affected Participants and beneficiaries with at least 30 but not more than 60 days' advance notice of the expected length of the Blackout Period in accordance with regulations issued by the DOL. In addition, Client or its designated Plan administrator will furnish the required blackout notice to individuals who become affected Participants or beneficiaries in the Plan after blackout notices have otherwise been furnished as soon as reasonably possible after such individuals become affected Participants or beneficiaries because whether and when any such individual becomes a Participant or beneficiary is unforeseeable and/or beyond Client's control. ADP anticipates that it will be able to generate and mail Personal Identification Number letters, which will enable Participants and beneficiaries to initiate Plan transactions through the Voice Response System and Participant website and submit forms to the Plan administrator for processing, within 15 business days from the date that ADP has received all records completely and accurately in a format acceptable to ADP from the prior recordkeeper and Trustee receives all reconciled assets of the Plan from the prior trustee or custodian. In the event that Client, in consultation with ADP, determines that the Blackout Period will extend beyond the date communicated in the initial blackout notice, or if Client determines that the Blackout Period will begin on a date other than that provided to Participants and beneficiaries in an initial blackout notice, Client will as soon as reasonably practicable inform ADP of the change, the new beginning or ending date of the Blackout Period, and the reason for the change, and Client or its designated Plan administrator will provide affected Participants and beneficiaries with advance notice of such modification of the Blackout Period as soon as reasonably practicable in accordance with DOL regulations. Client will provide to ADP a copy of the initial advance notice of the Blackout Period, as well as any advance notice of a modification thereof. All responsibilities relating to furnishing notice of the Blackout Period, as well as any advance notice of a modification thereof, are exclusively the responsibilities of Client or its designated Plan administrator. Any assistance that ADP agrees to provide to Client or its designated Plan administrator in connection with the preparation of either the initial advance notice of the Blackout Period or any advance notice of a modification thereof shall be wholly ministerial in nature and, subject to the ultimate direction, control, and authority of Client or its designated Plan administrator and Client expressly acknowledges, consistent with Section 16 of this Agreement, that any such assistance shall in no way render ADP the "Administrator" or "Plan Administrator" of the Plan.

7.  QUALIFIED PLAN COMPLIANCE; COMPLIANCE WITH LAWS AND GOVERNMENTAL REGULATIONS IN EFFECT AT THE TIME THE RECORDKEEPING OR OTHER RELATED SERVICES ARE PERFORMED

    A.  ADP will perform the qualified plan compliance services as indicated in the Administration Manual provided the requisite data,

as outlined in the Administration Manual and as requested from time to time, has been supplied in a complete, accurate and timely manner.

B.  All qualified plan compliance work not covered in this Agreement and the Administration Manual is the responsibility of Client. ADP has no responsibility for any qualified plan compliance work beyond the scope of this Agreement and the Administration Manual. All qualified plan compliance work performed by ADP is contingent upon receipt by ADP from the Plan administrator of complete and accurate census and any other data as requested from time to time by ADP as set forth in the Administration Manual.

C.  ADP will not be responsible for the tax-qualified status of the Plan, nor, except as otherwise expressly provided for hereunder, for payment of any federal, state or other taxes or penalties which may be charged against the Plan or other parties to the Plan. ADP will not be responsible for filing notices of any taxable or otherwise reportable events as defined under applicable law.

D.  Except as indicated herein, Client shall be responsible for (i) compliance with laws and governmental regulations, (including, but not limited to, all federal, state and/or local tax requirements and as indicated in the Administration Manual), (iii) the investment of the funds contributed to the Plan Trust, (iii) for any use it may make of the Services to assist it in complying with such laws and governmental regulations, and (iv) determining if its contributions to the Plan are substantial and recurring if Client sponsors a plan in the form of the ADP, Inc. Prototype Profit Sharing Plan. ADP shall not have any responsibility relating to Client's obligations as indicated in the Administration Manual (including, without limitation, advising Client of Client's responsibilities in complying with any laws or governmental regulations affecting Client's business). In elaboration of the foregoing, Client's responsibilities described under this section include, but are not limited to:

    (1) determining whether Client is a member of a controlled group under Internal Revenue Code (the "Code") Sections 414(b) and 414(c) or a member of an Affiliated Service Group under Section 414(m);

    (2) ensuring that all contributions and participant loan payments are segregated from the general assets of Client and received by the Trust under the Plan in accordance with the DOL's plan asset regulations;

    (3) ensuring that any Elective Deferrals, if applicable, and other contributions made to the Plan, when aggregated with any contribution to other qualified plans maintained by Client, or any member of Client's controlled group, is within the limitations permitted under the Code including, without limitation, Code Sections 410(b), 415, 416, and, if Client sponsors a plan in the form of the 401(k) component of the Plan, Code Section 402(g);

    (4) ensuring that Employer Contributions to the Plan, if any, do not exceed the amount deductible under Code Section 404; and

    (5) making any necessary adjustments, including without limitation, top heavy vesting and top heavy contributions; 415 adjustments; adjustments required by failure to follow the terms of the Plan; and, if Client sponsors a plan in the form of the 401(k) or (m) components of the Plan, adjustments to Actual Deferral Percentages and Actual Contribution Percentages under the Plan so that the Plan is in compliance with the requirements of Code Sections 401(k)and 401(m).

E.  In no event shall Client rely solely on its use of the Services under this Agreement in complying with any laws and governmental regulations. In particular, Client acknowledges and agrees that ADP does not have any obligation, responsibility or liability to cause the offer and/or sale by Client and Trustee of any permissible Plan investments to Client's employees to comply with the applicable

federal and state securities laws and the rules and regulations promulgated thereunder.

B.  **SELECTION AND SUBSTITUTION OF INVESTMENT FUND OPTIONS; MARKET TIMING FEES AND RESTRICTIONS**

A.  In selecting the Investment Funds to be made available for the investment of assets under the Plan, Client acknowledges receiving and reading prospectuses and/or other information with respect to the multi-class ownership structure of those funds with multiple classes of shares or units. Where more than one class of ownership was available to the Plan from a selected Investment Fund, Client represents that the different sales charges, ongoing fees and other features of each such class were considered and that the class of ownership to be offered by the Plan has been determined to be in the best interest of Plan participants. Client represents that all relevant factors including, but not limited to, the services to be received by Participants and the expenses to be incurred by the Plan, were taken into account when selecting the class of ownership to be offered.

B.  Client acknowledges that ADP and the entity that marketed the retirement program under which ADP performs the services provided to Client hereunder and who co-brands the program with ADP, if any (the "Marketing Entity") has not exercised, nor will exercise, any discretionary authority with respect to the selection of investments to be made by the Plan. All such authority shall reside exclusively with Client or the Plan's named fiduciary for such purpose ("Named Fiduciary") or another Plan fiduciary to whom the Named Fiduciary has properly delegated such authority. If Client has selected, and retains, a fixed investment portfolio made available by ADP and Marketing Entity, if any, such authority initially shall be exercised by entering into this Agreement or, subsequently, continuing to participate in an ADP prototype plan program. Neither ADP nor Marketing Entity shall have any fiduciary responsibilities whatsoever with respect to the Plan under ERISA. In this regard, although ADP and Marketing Entity ultimately have the authority to designate the list of Investment Funds available to be offered under the Plan, and reserve the right to modify the list, any modification which would result in the deletion or replacement of an Investment Fund in which the Plan is then invested that will affect the Client's ability to continue to offer the Investment Fund as an investment option under the Plan shall be done only upon 60 days' prior written notice to Client or the Plan's Named Fiduciary (the "Initial Notice Period"). The notice shall be accompanied by a prospectus for any replacement mutual fund (or other document describing the investment vehicle in the case of an Investment Fund other than a mutual fund). In general, the notice will (i) explain the proposed deletion or replacement of the affected fund(s); (ii) disclose any resulting changes in non-asset based fees paid to ADP, Marketing Entity or their respective affiliates by the Plan; (iii) identify the effective date of the deletion or replacement; (iv) explain that Client or Named Fiduciary will have the right to reject the deletion or replacement; and (v) state that the failure to object will be treated as a consent to the proposed deletion or replacement. Client should refer to the prospectus provided by ADP for details on asset-based fees that may be charged to the Plan or its Participants and beneficiaries by the Investment Fund(s), a portion of which may be paid, directly or indirectly, to ADP, Marketing Entity and/or their respective affiliates. Client may also make a written request to ADP for further details on the portion of such asset-based fees that is to be paid to ADP. If Client or the applicable Named Fiduciary (or its designee) does not approve of a deletion or replacement of one or more Investment Funds that will affect its ability to continue to offer the Investment Fund(s) under the Plan, it must notify ADP in writing within the Initial Notice Period. If Client or the Named Fiduciary rejects such a deletion or

replacement, Marketing Entity and ADP may, to the extent administratively feasible, generally seek to accommodate Client or the Named Fiduciary by retaining the original Investment Fund(s) or making available different replacement fund(s). If Marketing Entity and ADP decline to retain the original fund(s) for whatever reason and Client or the Named Fiduciary continues to reject deletion or replacement, the plan sponsor will have an additional 60 days following the Initial Notice Period (provided that timely notice of Client's rejection is given to ADP) to convert the plan to a different service provider (without penalty) before the change in Investment Funds goes into effect with respect to the Plan. In connection with its notification to affected plan sponsors of a specific deletion or replacement of an Investment Fund that will affect their ability to continue to offer the fund under their plan, ADP may afford Client an Initial Notice Period greater than 60 days to notify ADP in writing of the decision not to approve the deletion or replacement of an Investment Fund; provided, however, that if Client takes longer than 60 days to notify ADP, the additional 60-day period afforded to Client to convert the Plan to a different service provider shall be commensurately shortened by the same number of days in excess of 60 that Client takes to notify ADP. Except as otherwise provided herein, there will be a total of at least 120 days from the date of the notice of an investment Fund change before such a change in Investment Funds as described herein is implemented. Notwithstanding the foregoing, the minimum 60 and 120 day periods provided for in this Paragraph shall be subject to change as ADP may determine is required or appropriate under DOL opinion letters or other guidance.

In situations where a deletion or replacement of an Investment Fund affecting Client's ability to continue to offer the Investment Fund under the Plan is the result of actions taken by the director(s), trustee(s) and/or shareholders of a particular fund as opposed to a decision by ADP or Marketing Entity (as applicable) to delete or replace such fund, (i) the foregoing notice periods will not apply, (ii) ADP, Marketing Entity or an affiliate or division of either will provide the foregoing notice of the change to the Named Fiduciary as soon as reasonably practicable, and (iii) ADP and/or Marketing Entity will afford Client with as much time as is reasonably practicable under the circumstances to determine whether to accept the deletion or replacement of the Investment Fund.

C.  ADP and Marketing Entity may make separate brokerage accounts through which Participants and beneficiaries may direct the investment of their accounts ("Self-Directed Accounts"). In that case, if Client and/or the Named Fiduciary of the Plan determine that Self-Directed Accounts shall be made available as an investment alternative under the Plan, the availability of such accounts shall be deemed to be an Investment Fund for purposes of this paragraph 8B (but not paragraph 8A). Self-Directed Accounts shall be made available pursuant to the terms of one or more separate agreements between and among Client, ADP, Trustee and the broker-dealer that services the account, as applicable. Notwithstanding the foregoing, any services that ADP makes available with respect to Self-Directed Accounts shall be subject to the terms of this Agreement.

D.  Client acknowledges that (i) mutual funds (and potentially other Investment Funds) have established, or will establish, "excessive trading" restrictions and redemption fee rules designed to prevent short-term trading and market timing, and (ii) under various service agreements that ADP and/or its affiliates have entered into with mutual fund companies (or investment managers of Investment Funds) or their affiliates, ADP is required to implement "excessive trading" rules at least as restrictive as those required in the Investment Funds' prospectus (or in the case of collective trusts, other operative documents) and to collect redemption fees. Client

agrees that ADP shall implement such rules, which shall apply to Investment Fund transactions engaged in by Participants (or Client on Participants' behalf) through ADP's systems, and authorizes ADP to implement excessive trading rules that are more restrictive than those contained in the prospectus or operative documents in order to comply with such rules when ADP's system does not accommodate such rules.

9.  OWNERSHIP, LICENSES, CONFIDENTIALITY AND NONDISCLOSURE

A.  Client acknowledges that all computer programs and related documentation made available, directly or indirectly, by ADP to Client as part of the Services (the "ADP Products") are the exclusive and confidential property of ADP or the third parties from whom ADP has secured the right to use such computer programs and documentation. ADP and the third parties referred to in the immediately preceding sentence shall retain all rights and titles, to the extent of their respective interests, to all copyrights, trademarks, service marks, trade secrets and other proprietary rights in the applicable logo product names, ADP Products and Services.

B.  A personal, non-exclusive, non-transferable right and license is being granted to Client to use solely in connection with the Services any application programs included in the ADP Products (the "Software") which are delivered to Client as part of the Services. Client shall not have any interest in the Software, except for the license granted it under this Agreement.

C.  Client shall receive all improvements, enhancements, modifications and updates to any Software which are delivered to Client as part of the Services if and as they are made available by ADP at no cost, generally to its clients. All such improvements, enhancements, modifications and updates shall be delivered to Client in the form of a computer media which media shall be provided to Client by ADP and shall be installed by Client. Client shall immediately install any such media after its receipt from ADP.

D.  Client may make one copy of each diskette or other media (other than those which include mechanisms to limit or inhibit copying and are marked "copy protected") on which the Software is contained for Client's backup or archival purpose in support of Client's use of the Services. Except as set forth in the immediately preceding sentence, Client shall not copy in whole or in part, any of the ADP Products (including the Software) or related documentation.

E.  CLIENT WILL NOT MAKE ANY ALTERATION, CHANGE OR MODIFICATION TO ANY OF THE ADP PRODUCTS (INCLUDING THE SOFTWARE) OR TO ANY OF THE ADP SUPPORTED FILES USED BY ADP IN CONNECTION WITH PROVIDING THE SERVICES TO CLIENT. CLIENT MAY NOT RECOMPILE, DECOMPILE, DISASSEMBLE, REVERSE ENGINEER, OR MAKE, OR DISTRIBUTE ANY OTHER FORM OF, OR ANY DERIVATIVE WORK FROM, THE ADP PRODUCTS (INCLUDING THE SOFTWARE) AND/OR THE SERVICES.

F.  Client shall treat as confidential and will not disclose or otherwise make available any of the ADP Products or any trade secrets, processes, proprietary data, information or documentation related thereto including, without limitation, any flow charts, logic diagrams or source codes (collectively the "Confidential Information"), in any form, to any person other than employees of Client. Client will instruct its employees who have access to the Confidential Information to keep the same confidential by using the same care and discretion that Client uses with respect to its own confidential property and trade secrets. Upon the termination of this Agreement for any reason, Client shall return to ADP any and all copies of Confidential Information which are in its possession.

10.  RETURN OF SOFTWARE

Immediately after the termination of this Agreement or the cancellation of any license or sublicense granted hereunder for Software, if any,

Client shall deliver and return to ADP all copies of the affected Software, and related documentation (if any) in Client's possession.

11.  CONFIDENTIALITY; FILE SECURITY; RETENTION

A.  ADP shall treat as confidential any Client Files or other information provided by Client to ADP for use in connection with the Services under the Agreement and identified by Client, in writing, as confidential information. ADP will not, without written authorization by Client, disclose or otherwise make available such confidential information to any person other than Trustee or employees, agents or other representatives of ADP with a need-to-know. ADP will instruct its employees and the Trustee who have access to Client Files to keep the same confidential by using the same care and discretion that ADP, or Trustee, uses with respect to its own confidential property and trade secrets. Notwithstanding anything contained herein, ADP may disclose confidential information to the entity, if any, which marketed the product to Client, provided such entity has agreed in writing to keep such information confidential. Such confidential information shall remain the exclusive and confidential property of Client. However, Client acknowledges and agrees that ADP may disclose Client Files that may otherwise be considered confidential as required by law and that such disclosure shall not be considered a violation of this Agreement.

B.  ADP shall provide reasonable security provisions to insure that third parties (other than those identified in Section 11A or 15B of this Agreement) do not have access to Client Files. ADP reserves the right to issue and change regulations and procedures from time to time to improve file security.

C.  ADP shall take reasonable precautions to prevent the loss of or alteration of Client Files, but ADP makes no guarantee against such loss or alteration. Accordingly, Client, to the extent it deems necessary, shall maintain copies of all documents delivered to ADP. Furthermore, Client will maintain a procedure external to the ADP system for the reconstruction of lost or altered Client Files.

D.  ADP shall retain Client Files in its possession as required by applicable law or regulation. ADP will dispose of Client Files in any manner it deems appropriate. However, if Client requests that Client Files be returned to it, ADP will provide Client with Client Files in a standard ADP format and at ADP's then standard rates for such format. Notwithstanding the foregoing, ADP shall not be obligated to provide Client with Client Files unless ADP has received payment for all Services rendered pursuant to this Agreement.

E.  ADP may use Client Files to compile statistical data in which Client Files are not identifiable. Such statistical data shall be the sole and absolute property of ADP and ADP shall have the sole right to use, sell and distribute such statistical data.

12.  DEFAULT OF CLIENT; REMEDIES UPON DEFAULT

Should Client (a) default in the payment of any sum due under this Agreement, (b) default in the performance of any of its other obligations under this Agreement, (c) no longer be a payroll services client of ADP, or, with respect to non-payroll services clients of ADP, fail to use data collector software provided by ADP, (d) amend the Plan, in such a manner to cause it to be deemed to have adopted an individually designed plan, (e) adopt a plan other than the Plan or amend the Plan in such a manner not to cause it to be deemed to have adopted an individually designed plan but that impairs the ability of ADP to effectively perform its duties under this Agreement, (f) adopt any administrative rules or procedures inconsistent with the Administration Manual, or (g) fail to permit participants to begin making salary deferrals within 90 days of the date that ADP notifies Client that ADP can begin to process salary deferrals, (h) fail to cause assets to be placed in trust such that the trust shall be deemed to have a corpus for state law purposes, or (i) commit an act of bankruptcy or become

the subject of any proceeding under the Bankruptcy Code or become insolvent, or if any substantial part of Client's property becomes subject to any levy, seizure, assignment, application or sale for or by any creditor or governmental agency, or if the trust agreement between Client and Trustee is terminated and Client does not enter into a trust agreement with a successor Trustee acceptable to ADP, then, in any such event, ADP, at its option, may, upon written notice thereof (i) terminate this Agreement, (ii) declare all amounts due and to become due immediately due and payable, and (iii) whether or not this Agreement is terminated, take immediate possession of any Software, wherever situated, and for such purpose enter upon any premises without liability for so doing. The remedies contained in this paragraph are cumulative and in addition to all other rights and remedies available to ADP under this Agreement, by operation of law or otherwise.

13. **LIMITATION OF ADP'S LIABILITY**

Except as herein provided in this Section 13, which sets forth the full extent of ADP's liability under this Agreement, ADP shall not be subject to any liability (monetary or otherwise) and Client and any third party shall not be entitled to any remedial relief for ADP's conduct under this Agreement.

A. ADP's obligations and responsibilities under this Agreement are governed solely by the provisions of this Agreement.

B. ADP is obligated to provide Services under this Agreement only to the extent that such Services pertain to the Plan. In no circumstances is ADP obligated, in any manner, to provide Services or other assistance to Client in relation to any other plan, qualified or nonqualified, maintained by Client.

C. ADP is not required, under the terms of this Agreement, to review any action of Client or committee appointed to administer the Plan (the "Committee"). Furthermore, ADP will not incur any liability by taking, permitting, or omitting any actions on the basis of any action by Client or Committee or for carrying out the directions of Client or Committee.

D. ADP's sole liability to Client or any third party for claims arising out of errors or omissions by ADP under the terms of this Agreement, regardless of the form of such claims (e.g., contract, negligence or otherwise), shall be to address and resolve Client's complaint with respect to the alleged errors or omissions. Client shall not be entitled to monetary damages for the claims described in the immediately preceding sentence but shall be entitled to a correct report or the correct data.

E. Subject to any further limitations otherwise contained herein, ADP shall not be liable for any delay or failure to perform under this Agreement resulting, directly or indirectly, from any cause beyond the reasonable control of ADP. In case of errors or lost data caused by power failure, mechanical difficulties with information storage and retrieval systems, or other events not attributable to its own gross negligence or willful misconduct, ADP's sole obligation will be to use its reasonable efforts to reconstruct any records maintained by ADP and to amend any reports prepared by it which may have been affected by such event, at its own expense. Performance by ADP of its obligations under this Agreement is subject to appropriate adjustment and extension of time in the event of strike, fire, war, insurrection, riot, electrical failure or any other event that would constitute force majeure under New York law, or in the event of a circumstance beyond ADP's control.

F. ADP's sole liability under this Agreement for money damages resulting from claims made by Client arising from or related to the fraudulent or dishonest acts or omissions of ADP's officers, employees or agents in transferring contributions under the Plan to

the Trustee shall be limited to the loss of funds caused solely by such fraudulent or dishonest acts or omissions.

G. Except as otherwise set forth in Paragraphs 13F and 13H, ADP shall not have any monetary liability under this Agreement for any damages resulting from claims made by Client or any third party arising from or related to any and all causes covered by Paragraphs 13A, 13B, 13C, 13D, 13E, 13F, 13H, 13I and 13J. ADP's sole liability under this Agreement for damages (monetary or otherwise) resulting from claims made by Client or any third party arising from or related to any and all causes not covered by Paragraphs 13A, 13B, 13C, 13D, 13E, 13F, 13H, 13I and 13J shall be limited to the lesser of either (x) the amount of the actual damages incurred by Client or (y) the amount which will not exceed the average month's service fee paid by Client to ADP during the one year preceding the month in which the damage or injury is alleged to have occurred, or such lesser number of months if Client has not received the Services under this Agreement for at least one year.

H. ADP SHALL NOT BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH CLIENT OR ANY THIRD PARTY MAY INCUR OR EXPERIENCE ON ACCOUNT OF ENTERING INTO OR RELYING ON THIS AGREEMENT, EVEN IF ADP HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

I. ADP is entitled to rely upon the accuracy of all information supplied by Client and will not be responsible for errors, delays, or additional costs resulting from the receipt of incomplete, inaccurate or untimely information, or information provided in an unacceptable format or media, from Client, Client's agents, Client's representatives or Trustee. In the event that Client supplies incorrect information to ADP, ADP's sole responsibility shall be to use reasonable efforts to correct any resulting errors in the reports or data it has prepared for Client. Such services shall be treated as additional services provided under this Agreement and shall entitle ADP to remuneration in accordance with ADP's then prevailing prices for such services.

J. In the event that Client has an existing tax-qualified plan, ADP shall have no liability for any losses attributable to any discrepancy between assets in Client's plan immediately prior to the conversion to the Plan, and assets actually transferred to the Plan, and in the event there is a subsequent transfer of assets, there shall be no obligation by ADP to make any adjustments to the amount of funds transferred.

K. Unless Client reports any alleged error or omission arising under this Agreement to ADP within 90 days of the receipt of the report or summary in which such alleged error or omission occurred, Client shall not be entitled to any remedial relief for ADP's conduct under this Agreement with respect to such alleged error or omission.

14. **INDEMNIFICATION**

Client shall indemnify and hold harmless ADP and its employees, agents, and/or subcontractors from and against any loss, damage, liability, claim, cost, and expense, including reasonable legal fees, which it incurs by reason of this Agreement unless resulting from the gross negligence or willful misconduct of ADP or its employees, agents, or subcontractors.

15. **SUCCESSORS AND ASSIGNS**

A. Client may not assign this Agreement, in whole or in part, without the prior written consent of ADP, and any attempt by Client to assign any of its rights, duties, or obligations which arise under this Agreement without such consent will be void.

B. ADP may designate any agent or subcontractor, without notice to, or the consent of Client, the obligation to perform such tasks and functions to complete any recordkeeping and related services.

However, nothing in the preceding sentence shall relieve ADP from responsibility for performance of its duties under the terms of the Agreement.

16. STATUS OF ADP

A. CLIENT EXPRESSLY ACKNOWLEDGES THAT ADP IS NOT THE "ADMINISTRATOR" OR "PLAN ADMINISTRATOR" AS DEFINED IN SECTION 3(16)(A) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 ("ERISA") AND IN SECTION 414(g) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED ("CODE"), RESPECTIVELY, NOR IS ADP A "FIDUCIARY" WITHIN THE MEANING OF ERISA SECTION 3(21). ADP SHALL NOT EXERCISE ANY DISCRETIONARY AUTHORITY OR DISCRETIONARY CONTROL RESPECTING MANAGEMENT OF THE PLAN OR MANAGEMENT OR DISPOSITION OF PLAN ASSETS. ADP SHALL NOT RENDER INVESTMENT ADVICE FOR A FEE OR OTHER COMPENSATION, DIRECT OR INDIRECT, WITH RESPECT TO ANY MONEYS OR OTHER PROPERTY OF THE PLAN, NOR DOES ADP HAVE ANY AUTHORITY OR RESPONSIBILITY TO DO SO. ADP HAS NO DISCRETIONARY AUTHORITY OR DISCRETIONARY RESPONSIBILITY IN THE ADMINISTRATION OF THE PLAN.

B. CLIENT ACKNOWLEDGES THAT ADP ADVISED IT TO CONSULT AND THAT IT HAS CONSULTED, TO THE EXTENT CLIENT CONSIDERED NECESSARY, WITH ITS LEGAL AND TAX ADVISORS.

C. The parties further acknowledge and agree that ADP will not be deemed to be providing legal, investment, or tax advice to Client as a result of the ministerial duties undertaken by ADP as contemplated herein.

17. AMENDMENT; ENTIRE AGREEMENT

A. This Agreement will not be subject to modification except in writing signed by both ADP and Client. In this regard, ADP will not accept nor be bound by any purported modification, which is not in writing and executed by a duly authorized representative of ADP.

B. Client acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement. Client acknowledges that there are no agreements or understandings, either written or oral, between itself and ADP with respect to Services contemplated to be rendered hereunder and that this Agreement, including the attached exhibits, supersedes all existing agreements or understandings and constitutes the entire agreement between the parties concerning its subject matter.

18. SEVERABILITY

In case any provision of this Agreement (or any portion thereof) is held to be or becomes invalid, illegal or unenforceable in certain circumstances, the validity, legality or enforceability of the remaining provisions of this Agreement, or of such provision in other circumstances, shall not in any way be affected or impaired thereby.

19. LEGAL FEES

In the event of any action or proceeding between the parties, whether by suit, arbitration or otherwise, as to their obligations and rights under this Agreement, the prevailing party shall be entitled to all costs incurred in connection therewith, including reasonable legal fees.

20. NOTICE

Any notice under this Agreement shall be given in writing by certified mail, return receipt requested, to the applicable address set forth in the preamble of this Agreement.

21. DISCLAIMER

In the event that Client retains a third party service provider to provide additional services not covered by the Agreement, Client disclaims any right to sue ADP, its directors, officers, employees and any affiliate for any losses sustained by Client, or the Plan, as a result of any act or failure to act, by such third party service provider (including, but not limited to, any negligence or willful misconduct) and Client's sole remedy under such circumstances shall be to proceed against such third party service provider.

22. HEADINGS

The headings in this Agreement are intended for convenience of reference and shall not affect its interpretation.

23. THIRD PARTY BENEFICIARIES

No employee, agent or other person associated with Client is intended to be a third party beneficiary under the terms of this Agreement.

24. VOICE RESPONSE SYSTEM

Participants will be permitted to initiate certain transactions via the ADP Voice Response System, as described in the Administration Manual. Client hereby authorizes ADP to act upon such instructions in a ministerial capacity without question, and, subject to Section 13 of this Agreement, fully indemnifies ADP for any liabilities arising in connection with same. ADP does not guarantee the 24-hour availability of such system.

25. TERMS FOR THE USE OF PARTICIPANT AND PLAN SPONSOR INTERNET

ADP and Client agree to the following terms and conditions for the use of (1) an internet service provided by ADP (referred to herein as "Participant Internet"), by the Participants and beneficiaries (collectively referred to as "Participants" for purposes of this Section) participating in the Plan, and if ADP so notifies Client, other employees eligible to participate in the Plan (collectively, "Participants") and (2) ADP's internet service to be provided to Client with respect to the Plan ("Plan Sponsor Internet"). Participant Internet and Plan Sponsor Internet shall first be available on the date that ADP notifies Client of their respective availability. ADP may terminate this provision and discontinue Participants' access to Participant Internet, or Client's access to Plan Sponsor Internet, at any time, provided that this provision shall terminate in any event on the date that this Agreement terminates, if earlier.

The right to use Participant Internet is granted solely to the Participants of the Plan and the right to use Plan Sponsor Internet is granted solely to Client or its designated agent(s), if any. The right to use Participant Internet and Plan Sponsor Internet is granted only for the purposes of viewing data made available thereunder, to submit to ADP instructions regarding certain plan-related transactions and such other purposes designated by ADP, all as described in any communications to Client and/or Participants by ADP, and such right may not be transferred or sublicensed to, or accessed by, any other user. ADP may modify (or delete), update, enhance, or add additional services to, Participant Internet or Plan Sponsor Internet in its sole discretion, and such changes shall be subject to any conditions ADP may specify to Client and/or Participants. By signing this Agreement, the Employer agrees that the use of Participant Internet and Plan Sponsor Internet as provided for herein by Participants or Client is subject to the terms of any Rules and Regulations (i.e., Terms and Conditions) set forth by ADP on each such Internet site.

Client agrees that any service mark that is attributable to Participant Internet or Plan Sponsor Internet of which ADP provides notice to Client (i.e., the "Service Marks") are service marks owned by ADP, and that Client and Plan Participants have no rights or interests in the Service Marks, in the underlying software or technology, or otherwise. Neither Client nor the Plan Participants shall have any right to reproduce, use, or authorize the reproduction or use of, the Service Marks without the express authorization of ADP. Client and Participants are solely responsible for obtaining, installing and maintaining any hardware, software, telecommunication lines and Internet access as may be necessary to obtain access to Participant

Internet and Plan Sponsor Internet and complying with the terms of any third party software license.

ADP shall provide a reasonable level of security with respect to Participant Internet and Plan Sponsor Internet, including (1) at least a 40-bit encryption with the secure socket layer security protocol, (2) a Participant log-on procedure for Participant Internet that includes the entry by the Participant of their Social Security Number and a Personal Identification Number ("PIN") and (3) a Plan Sponsor Internet log-on procedure that requires the authorized representative of Client to enter a Social Security Number and PIN. ADP may, at its option and in its sole discretion, modify these security procedures. Client acknowledges that the use of Participant Internet by Participants and Plan Sponsor Internet by Client involves the transmission of proprietary and confidential information of Client, the Plan and/or Participants over the Internet, including one or more intermediary data networks, public switched telephone networks and computers, that are not owned, operated or controlled by ADP and may be unsecure or unavailable from time to time. Accordingly, ADP does not guarantee the security of information under, or access to Participant Internet or Plan Sponsor Internet and is not responsible to discover, audit or report to Client or Participants any unauthorized disclosure or use of Participant Internet or the Plan Sponsor Internet. Client is responsible for enforcing this Agreement with respect to its employees and Participants and taking appropriate steps to limit access to Participant Internet and Plan Sponsor Internet. ADP may provide or make available reports or other documents with respect to the Plan to Client through Plan Sponsor Internet that are encrypted with an encryption key provided by Client. ADP agrees that it shall not intentionally divulge that encryption key or distribute any document so encrypted to any other party.

ADP does not guarantee uninterrupted access to Participant Internet or Plan Sponsor Internet and shall not be responsible for any communication failure with respect thereto. Client acknowledges that Participant transactions may be communicated to ADP by other means, including the Voice Response System made available to Participants under the Services Agreement.

DISCLAIMER OF WARRANTY

NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, ADP DISCLAIMS ALL WARRANTIES REGARDING PARTICIPANT INTERNET AND PLAN SPONSOR INTERNET, INCLUDING BUT NOT LIMITED TO ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE OR USE.

Client acknowledges that information provided on or through Participant Internet, other than information regarding a Participant's own account and general Plan information, unless otherwise agreed

to in writing by ADP, is not intended to be the primary basis for individual investment decisions by Participants; Participant Internet is intended to provide general information for educational purposes and not investment advice by ADP or any other party. Access by a Participant to Participant Internet must be accompanied or preceded by appropriate prospectuses or disclosure material for all investment options available under the Plan.

IMPORTANT DISCLOSURE

The DOL issued Field Assistance Bulletin 2002-3 to its regional office personnel stating its policies regarding the receipt by retirement plan service providers of compensation in the form of interest income earned in connection with transactions involving the plan. The DOL bulletin stated that service providers should disclose certain information regarding this interest income so that employee benefit clients can reasonably approve the arrangement based on an understanding of the service provider's receipt of this compensation. In order to comply with this requirement, ADP has provided below information regarding its receipt of compensation in the form of interest earned on contributions and plan loan repayments following the date that these amounts are debited from an employer's bank account, but prior to the date they are forwarded to the trustee of the plan.

ADP earns interest on employee and employer contributions, as well as repayments of loans taken by participants from their plan accounts. Once ADP completes its reconciliation of employer and plan records regarding these contributions and loan repayments, ADP's bank initiates a debit of (i.e., "impounds") the employer's bank account for the correct amount of funds through the Automated Clearing House ("ACH") system. The date that ADP initiates this debit is called the "impound date." It may take up to three business days from the impound date for ADP to receive the funds. ADP will, absent unusual circumstances, forward the funds it receives to the trust no later than the business day following the date that it receives the funds. Thus, the period that ADP will earn interest on funds representing contributions and loan repayments for an employer's plan is generally one business day.

ADP invests funds that it has impounded from clients' bank accounts in or pursuant to the following types of investments: bank obligations (time deposits, certificates of deposit, bankers acceptances and bank notes); corporate notes; taxable, tax-exempt, and asset-backed commercial paper; money market funds; repurchase agreements; reverse repurchase agreements; asset backed securities; mortgage-backed securities; auction rate products (excluding equity and inverse floaters); taxable and tax exempt municipal floaters; sovereigns; United States Treasury and United States Government Agency obligations; and supranationals. If you would like further information, including the average rate of return over ADP's prior fiscal year, please contact ADP in writing.

**EXHIBIT "B"**

| Request # | Plan No | Check No | Check Date | CK Clear Date | Check Amount | Payee Name |
|---|---|---|---|---|---|---|
| 31930 | 713050 | 0000004986 | 2/2/2011 | 2/14/2011 | 90,776.13 | BARBELLA, THOMAS J |

Page 1 of 1

Posting Date:        2011-02-14
Sequence #:          8690472461
Account #:           802907337
Routing Transit:     02130937
Amount #:            $90776.13
Check/Serial #:      000000004986
Bank #:              802
Tran Code:           000000
IRD:                 0
ItemType:            P
BOFD:                000000000
Cost Center:         N/A
Teller Number:       N/A
Teller Seq Number:   N/A
Processing Date:     N/A



DISBURSEMENT CHECK

ADP RETIREMENT SERVICES
1-866-713-6152

| Plan ID | Date of Check | Void After | |
|---|---|---|---|
| 713050 | 02/02/11 | 180 DAYS | 0000004986 |

NINETY THOUSAND SEVEN HUNDRED SEVENTY-SIX DOLLARS & 13/100

DOLLARS | CENTS
*****90,776 | 13

PAY TO THE ORDER OF
CHARLES SCHWAB
ROLLOVER TTE/CUST FBO THOMAS J BARBELLA
20 CHERRY LANE
SYOSSET, NY 11791

DISBURSEMENT ACCOUNT / PAYABLE AT
JPMORGAN CHASE BANK, N.A.
SYRACUSE, NY 13206

DIRECT ROLLOVER

"0000004986" ":021309379:802907337"

| Request # | Plan No | Check No | Check Date | CK Clear Date | Check Amount | Payee Name |
|-----------|---------|----------|------------|---------------|--------------|------------|
| 31931 | 713050 | 0000004928 | 2/1/2011 | 2/10/2011 | 86,460.91 | GERSTEIN, MITCHELL |

Page 1 of 1

| | |
|---|---|
| Posting Date: | 2011-02-10 |
| Sequence #: | 8390803017 |
| Account #: | 802907337 |
| Routing Transit: | 02130937 |
| Amount #: | $86460.91 |
| Check/Serial #: | 000000004928 |
| Bank #: | 802 |
| Tran Code: | 000000 |
| IRD: | 0 |
| ItemType: | P |
| BOFD: | 000000000 |
| Cost Center: | N/A |
| Teller Number: | N/A |
| Teller Seq Number: | N/A |
| Processing Date: | N/A |



| Request # | Plan No | Check No | Check Date | CK Clear Date | Check Amount | Payee Name |
|-----------|---------|----------|------------|---------------|--------------|------------|
| 31932 | 713050 | 0000005362 | 2/10/2011 | 2/17/2011 | 82,080.66 | FAIBISH, MAIR |

| | |
|---|---|
| Posting Date: | 2011-02-17 |
| Sequence #: | 1590331369 |
| Account #: | 802907337 |
| Routing Transit: | 02130937 |
| Amount #: | $82080.66 |
| Check/Serial #: | 000000005362 |
| Bank #: | 802 |
| Tran Code: | 000000 |
| IRD: | 0 |
| ItemType: | P |
| BOFD: | 000000000 |
| Cost Center: | N/A |
| Teller Number: | N/A |
| Teller Seq Number: | N/A |
| Processing Date: | N/A |



| Request # | Plan No | Check No | Check Date | CK Clear Date | Check Amount | Payee Name |
|---|---|---|---|---|---|---|
| 31933 | 713050 | 0000004987 | 2/2/2011 | 2/10/2011 | 128,415.44 | SHARIN, DAVID |

Page 1 of 1

Posting Date:         2011-02-10
Sequence #:           8290508899
Account #:            802907337
Routing Transit:      02130937
Amount #:             $128415.44
Check/Serial #:       000000004987
Bank #:               802
Tran Code:            000000
IRD:                  0
ItemType:             P
BOFD:                 000000000
Cost Center:          N/A
Teller Number:        N/A
Teller Seq Number:    N/A
Processing Date:      N/A





**EXHIBIT "C"**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In the Matter of

SYNERGY BRANDS, INC.,

                        Debtor.
------------------------------------------------------------X
KENNETH KIRSCHENBAUM, as Chapter 7
Trustee for the Estate of Synergy Brands, Inc.,

                        Plaintiff,

              -against-

THOMAS BARBELLA, MAIR FAIBISH,
MITCHELL GERSTEIN, DAVID SHARIN,
THE CHARLES SCHWAB CORPORATION,
JPMORGAN CHASE & CO., JANNEY
MONTGOMERY SCOTT LLC, & VANGUARD
FIDUCIARY TRUST COMPANY,

                      Defendants.
------------------------------------------------------------X

Chapter 7
Case No. 11-70412-dte


**COMPLAINT**


Adv. Pro. No.

      Plaintiff, by his attorneys, Kirschenbaum & Kirschenbaum, P.C., as and for his complaint herein alleges:

<u>THE PARTIES</u>

      1. The Plaintiff is the duly appointed and acting Chapter 7 Trustee (the "Trustee") for the estate (the "Estate") of Synergy Brands, Inc. (the "Debtor").

      2. The Defendant Thomas Barbella ("Barbella") is an individual who, for a period of time prior to the filing of the Debtor's bankruptcy petition, served as an Executive Vice President of the Debtor.

      3. The Defendant Mair Faibish ("Faibish") is an individual who, for a period of time prior to the filing of the Debtor's bankruptcy petition, served as the Chief Executive Officer of the Debtor.

4. The Defendant Mitchell Gerstein ("Gerstein") is an individual who, for a period of time prior to the filing of the Debtor's bankruptcy petition, served as the Chief Financial Officer of the Debtor.

5. The Defendant David Sharin ("Sharin" who, together with Barbella, Faibish, and Gerstein shall collectively be referred to as the "Insiders") is an individual who, for a period of time prior to the filing of the Debtor's bankruptcy petition, served as an Executive Vice President of the Debtor.

6. The Defendant The Charles Schwab Corporation ("Schwab") is a provider of investment services, including retirement and benefit plan services.

7. The Defendant JPMorgan Chase & Co. ("JP Morgan") is a financial services firm that provides retirement plan services.

8. The Defendant Janney Montgomery Scott LLC ("Janney") is a full-service financial services firm that provides investment services for individuals and corporations, including retirement plan services.

9. The Defendant Vanguard Fiduciary Trust Company ("Vanguard" who, together with Schwab, JP Morgan and Janney shall collectively be referred to as the "Banks") is an investment management company providing retirement plan services to its various customers.

## JURISDICTION AND VENUE

10. On January 28, 2011, the Debtor filed a voluntary petition (the "Petition") for relief pursuant to Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code").

11. This adversary proceeding arises out of and relates to the Chapter 7 case of the Debtor on the docket of this Court.

12. The statutory predicates upon which this adversary proceeding is based are 11 U.S.C. §§ 105(a), 704(a)(11) and The Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. §§ 1104, 1106 in that the proceeding seeks to: (a) restore to the Debtor's employer sponsored 401(k) Profit Sharing Plan funds distributed from the Profit Sharing Plan to the Insiders post-petition, amounting to the total sum of $396,377.36; (b) personally assess Gerstein for the aggregate pro rata share of expenses associated with the termination of the 401(k) Profit Sharing Plan that would be assessed by the Trustee against all the Insiders had they not received the post-petition distributions; (c) enjoin the Banks from making any distributions from the Insiders' custodial accounts held for the benefit of the Insiders unless directed to do so pursuant to Court Order; and (d) for such other and further relief as the Court deems just and proper.

13. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 & 1334.

14. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B).

15. This Court is the proper venue for this adversary proceeding pursuant to 28 U.S.C. § 1408.

## GENERAL ALLEGATIONS

16. Prior to the filing of the Petition, the Debtor sponsored an ERISA qualified retirement plan for the benefit of its employees entitled the Synergy Brands Inc. 401(k) Profit Sharing Plan (the "Plan").

17. Prior to the filing of the Petition, Gerstein served as the designated plan administrator of the Plan.

18. Gerstein is a fiduciary of the Plan as that term is defined by ERISA, 29 U.S.C. § 1002(21).

19. The Insiders, collectively and individually, constitute insiders of the Debtor as that term is defined by 11 U.S.C. § 101(31).

20. During December 2010, the Plan had an aggregate portfolio value (the "Trust Fund") of $744,888.80.

21. On January 31, 2011, three days after the Debtor filed its bankruptcy petition, Gerstein requested and obtained a distribution of all funds in his Plan account in the amount of $86,460.91.

22. Upon information and belief, Gerstein rolled-over his post-petition distribution in the amount of $86,460.91 to an IRA account with JP Morgan.

23. On February 1, 2011, four days after the Debtor filed its bankruptcy petition, Sharin requested and obtained a distribution of all funds in his Plan account in the amount of $128,415.44.

24. Upon information and belief, Sharin rolled-over his post-petition distribution in the amount of $128,415.44 to an IRA account with Vanguard.

25. On February 1, 2011, four days after the Debtor filed its bankruptcy petition, Barbella requested and obtained a distribution of all funds in his Plan account in the amount of $99,420.35.

26. Upon information and belief, Barbella rolled-over his post-petition distribution in the amount of $99,420.35 to an IRA account with Schwab.

27. On February 9, 2011, twelve days after the Debtor filed its bankruptcy petition, Faibish requested and obtained a distribution of all funds in his Plan account in the amount of $82,080.66.

28. Upon information and belief, Faibish rolled-over his post-petition distribution in the amount of $82,080.66 to an IRA account with Janney.

29. In total, the Insiders received distributions from their Plan accounts in the aggregate sum of $396,377.36 after the filing of the Petition (the "Post-Petition Distributions").

30. As of March 14, 2011, there were a total of twelve active participants remaining in the Plan.

31. As of March 14, 2011, the total value of the Trust Fund remaining in the Plan portfolio aggregated to $247,902.49.

32. In accordance with 11 U.S.C. § 704(a)(11), the Trustee is required to continue to perform the duties required of the plan administrator as of the date of the filing of the petition.

33. In order to avoid disqualification of the Plan by the IRS, the Plan must continue to be administered.

34. In accordance with Section 2.4 of the Plan Trust Agreement, the Trustee shall pay benefits, fees, and/or dividends paid on Employer Securities, if any, from the Trust Fund only upon receipt of written direction from the Plan Administrator or its designee.

35. In accordance with Section 6.2 of the Plan Trust Agreement, all fees and expenses incurred in the administration of the Trust Fund shall be paid from the assets of the Trust Fund, unless paid by the Employer.

36. The bankruptcy Trustee did not provide written direction to the Plan trustee to make any distributions to the Insiders after the filing of the Petition.

37. The bankruptcy Trustee did not provide written direction to any designee to provide direction to the Plan trustee to make any distributions from the Trust Fund post-petition.

38. The Insiders, who received distribution of their Plan funds post-petition, have diminished the Trust Fund, thereby substantially increasing the pro rata costs of the remaining Plan participants in connection with the payment of fees and expenses which will actually and properly be incurred in connection with the termination of the Plan and the distribution of the Trust Fund post-petition.

39. A restoration to the Trust Fund of the Post-Petition Distributions received by the Insiders will permit an equitable pro rata assessment against all plan participants as of the date of filing of the Petition to the extent necessary to pay all fees and expenses actually and necessarily incurred in connection with the termination of the Plan and the distribution of the Trust Fund.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST THE INSIDERS FOR THE RESTORATION OF THE POST-PETITION DISTRIBUTIONS UNDER 11 U.S.C. § 105(a)

40.  As insiders and former officers of the Debtor, the Insiders knew or should have known of the bankruptcy petition filing and its consequences with respect to the termination of the Plan post-petition.

41.  As a consequence of the Insiders receiving distribution of their Plan funds post-petition, the Trustee is unable to assess their Plan funds pro rata with the remaining participants, leaving the remaining participants with the burden of paying the total costs and expenses incurred in connection with the termination of the Plan.

42.  As a matter of equity, the Insiders should share on a pro rata basis in the payment of the costs and expenses that will be incurred in connection with the Plan termination.

43.  By virtue of the foregoing, and pursuant to 11 U.S.C. § 105(a), the Court should apply equitable principles in directing the restoration of the Post-Petition Distributions to the Plan by the Insiders, thereby causing the Insiders to share, on a pro rata basis, in the payment of the costs and expenses incurred in terminating the Plan.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST GERSTEIN FOR THE RECOVERY OF THE POST-PETITION DISTRIBUTIONS UNDER ERISA, 29 U.S.C. § 1104

44.  As the pre-petition plan administrator and a fiduciary of the Plan, Gerstein had a duty to exercise a prudent man standard of care with respect to the Plan participants in accordance with ERISA, 29 U.S.C. § 1104(a).

45.  By allowing the Post-Petition Distributions to the Insiders, Gerstein effectively obligated the remaining Plan participants to pay the total costs and expenses of terminating the Plan, with no contribution from the Insiders.

46.  By virtue of the foregoing, Gerstein should be directed to restore to the Trust Fund a sum equal to the amount the Insiders would have been assessed for the payment of administrative

costs and expenses had the Insiders not received the Post-Petition Distributions, thereby allowing

the remaining participants to be assessed for the costs and expenses incurred in connection with the

termination of the Plan to the same extent as if the Post-Petition Distributions to the Insiders were

not made.

<div align="center">

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST GERSTEIN FOR THE
RESTORATION OF POST-PETITION DISTRIBUTIONS BECAUSE DISTRIBUTIONS
CONSTITUTED PROHIBITED TRANSACTIONS UNDER ERISA, 29 U.S.C. § 1106**

</div>

47.  As plan administrator, Gerstein had an obligation to place a freeze on Trust Fund

distributions upon the filing of the Debtor's bankruptcy Petition.

48.  Following the filing of the Petition, Gerstein permitted the Post-Petition Distributions

for the benefit of himself and the Insiders to the detriment of the remaining Plan participants.

49.  The Post-Petition Distributions constituted prohibited transactions under ERISA, 29

U.S.C. § 1106.

50.  By virtue of the foregoing, Gerstein should be directed to restore to the Trust Fund a

sum equal to the amount the Insiders would have been assessed for the payment of administrative

fees and expenses had the Insiders not received the Post-Petition Distributions, thereby allowing the

remaining participants to be assessed for the costs and expenses incurred in connection with the

termination of the Plan to the same extent as if the Post-Petition Distributions to the Insiders were

not made.

<div align="center">

**AS AND FOR A FOURTH CAUSE OF ACTION AGAINST GERSTEIN AS PLAN
ADMINISTRATOR SEEKING THE RESTORATION OF FUNDS SUFFICIENT TO
COVER THE PRO RATA ASSESMENT OF EXPENSES OF ALL INSIDERS**

</div>

51.  As the pre-petition plan administrator, Gerstein had a higher burden of care to the Plan

than the other Insiders.

52. Based upon the Plan Agreement, Gerstein knew, or should have known, that there would be costs and expenses incurred in connection with the termination of the Plan which the Plan participants would be required to pay on a pro rata basis from the Trust Fund accounts.

53. Gerstein breached his fiduciary duty with respect to the Plan and the Plan participants by failing to freeze disbursements from the Plan upon the filing of the Petition.

54. Gerstein breached his fiduciary duty with respect to the Plan and the Plan participants by seeking and obtaining his Post-Petition Distribution, leaving the few remaining Plan participants to bear the total costs of terminating the Plan.

55. Gerstein breached his fiduciary duty with respect to the Plan and the Plan participants by allowing the other Insiders to receive their Post-Petition Distributions, leaving the few remaining Plan participants to bear the total costs of terminating the Plan.

56. Pursuant to 11 U.S.C. § 105(a), the Court should apply its equitable authority in assessing Gerstein personally for the pro rata share of expenses which would have been assessed against all Insiders in connection with the termination of the Plan had they not received the Post-Petition Distributions to the extent that any of the other Insider(s) fails to restore his Post-Petition Distribution to the Plan.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST JP MORGAN ENJOINING IT FROM MAKING ANY DISTRIBUTION FROM GERSTEIN'S ACCOUNT PENDING THE RESTORATION OF SUCH FUNDS TO THE PLAN

57. Upon information and belief, Gerstein's Post-Petition Distribution in the amount of $86,460.91 was rolled-over to a custodial account maintained at JP Morgan.

58. If JP Morgan distributes such funds to Gerstein or a third-party, the Trustee's underlying request for relief in the restoration of such funds back to the Trust Fund of the Plan will be rendered moot, thereby causing irreparable harm to the remaining Plan participants.

59. As such, pursuant to 11 U.S.C. § 105(a), the Court should apply its equitable authority to enjoin JP Morgan from making any distribution from Gerstein's custodial account up to the sum of $86,460.91 pending a final, non-appealable Order of the Court either restoring such funds to the Trust Fund of the Plan or denying the restoration of such funds to the Trust Fund.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST VANGUARD ENJOINING IT FROM MAKING ANY DISTRIBUTION FROM SHARIN'S ACCOUNT PENDING THE RESTORATION OF SUCH FUNDS TO THE PLAN

60. Upon information and belief, Sharin's Post-Petition Distribution in the amount of $128,415.44 was rolled-over to a custodial account maintained at Vanguard.

61. If Vanguard distributes such funds to Sharin or a third-party, the Trustee's underlying request for relief in the restoration of such funds back to the Trust Fund of the Plan will be rendered moot, thereby causing irreparable harm to the remaining Plan participants.

62. As such, pursuant to 11 U.S.C. § 105(a), the Court should apply its equitable authority to enjoin Vanguard from making any distribution from Sharin's custodial account up to the sum of $128,415.44 pending a final, non-appealable Order of the Court either restoring such funds to the Trust Fund of the Plan or denying the restoration of such funds to the Trust Fund.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST SCHWAB ENJOINING IT FROM MAKING ANY DISTRIBUTION FROM BARBELLA'S ACCOUNT PENDING THE RESTORATION OF SUCH FUNDS TO THE PLAN

63. Upon information and belief, Barbella's Post-Petition Distribution in the amount of $99,420.35 was rolled-over to a custodial account maintained at Schwab.

64. If Schwab distributes such funds to Barbella or a third-party, the Trustee's underlying request for relief in the restoration of such funds back to the Trust Fund of the Plan will be rendered moot, thereby causing irreparable harm to the remaining Plan participants.

65. As such, pursuant to 11 U.S.C. § 105(a), the Court should apply its equitable authority to enjoin Schwab from making any distribution from Gerstein's custodial account up to the sum of

$99,420.35 pending a final, non-appealable Order of the Court either restoring such funds to the Trust Fund of the Plan or denying the restoration of such funds to the Trust Fund.

### AS AND FOR A EIGHTH CAUSE OF ACTION AGAINST JANNEY ENJOINING IT FROM MAKING ANY DISTRIBUTION FROM FAIBISH'S ACCOUNT PENDING THE RESTORATION OF SUCH FUNDS TO THE PLAN

66.  Upon information and belief, Faibish's Post-Petition Distribution in the amount of $82,080.66 was rolled-over to a custodial account maintained at Janney.

67.  If Janney distributes such funds to Faibish or a third-party, the Trustee's underlying request for relief in the restoration of such funds back to the Trust Fund of the Plan will be rendered moot, thereby causing irreparable harm to the remaining Plan participants.

68.  As such, pursuant to 11 U.S.C. § 105(a), the Court should apply its equitable authority to enjoin Janney from making any distribution from Gerstein's custodial account up to the sum of $82,080.66 pending a final, non-appealable Order of the Court either restoring such funds to the Trust Fund of the Plan or denying the restoration of such funds to the Trust Fund.

### RELIEF REQUESTED

WHEREFORE, the Trustee respectfully requests judgment against the Defendants:

(a) directing the Insiders to restore to the Debtor's employer sponsored 401(k) Profit Sharing Plan those funds distributed from the Profit Sharing Plan to the Insiders post-petition, amounting to the total sum of $396,377.36;

(b) personally assessing Gerstein for the aggregate pro rata share of expenses associated with the termination of the 401(k) Profit Sharing Plan that would be assessed by the Trustee against all the Insiders had they not received the Post-Petition Distributions to the extent that any of the Insider(s) fails to restore his Post-Petition Distribution to the Profit Sharing Plan;

(c) enjoining the Banks from making any distributions from the Insiders' custodial accounts held for the benefit of the Insiders unless directed to do so pursuant to Court Order; and

(d) for such other and further relief as the Court deems just and proper.

Dated: Garden City, New York      KIRSCHENBAUM & KIRSCHENBAUM, P.C.
         March 28, 2011            Attorneys for the Trustee

By: *Fletcher W. Strong*
        Fletcher W. Strong
        Kirschenbaum & Kirschenbaum, P.C.
        200 Garden City Plaza
        Garden City, New York 11530
        (516) 747-6700

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In the Matter of

SYNERGY BRANDS, INC.,

                Debtor.

------------------------------------------------------------X
KENNETH KIRSCHENBAUM, as Chapter 7
Trustee for the Estate of Synergy Brands, Inc.,

                Plaintiff,

        -against-

THOMAS BARBELLA, MAIR FAIBISH,
MITCHELL GERSTEIN, DAVID SHARIN,
THE CHARLES SCHWAB CORPORATION,
JPMORGAN CHASE & CO., JANNEY
MONTGOMERY SCOTT LLC, & VANGUARD
FIDUCIARY TRUST COMPANY,

                Defendants.

------------------------------------------------------------X

Chapter 7
Case No. 11-70412-dte

Adv. Pro. No. 11-08908

## MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S APPLICATION FOR AN ORDER SCHEDULING A HEARING ON EXPEDITED NOTICE TO CONSIDER THE TRUSTEE'S REQUEST FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

KIRSCHENBAUM & KIRSCHENBAUM, P.C.
Attorneys for Plaintiff
200 Garden City Plaza
Garden City, New York 11530
(516) 747-6700

## **INTRODUCTION**

This motion seeks the imposition of a temporary restraining order ("TRO") and preliminary injunction so as to preserve the status quo with respect to funds (the "Funds") currently on deposit in financial accounts (the "Accounts") maintained by The Charles Schwab Corporation, JPMorgan Chase & Co., Janney Montgomery Scott LLC, and Vanguard Fiduciary Trust Company (collectively, the "Banks") for the benefit of Thomas Barbella, Mair Faibish, Mitchell Gerstein, and David Sharin (the "Insiders") pending a final determination of the underlying adversary proceeding.  Such a restraint on the Accounts is necessary to prevent the Insiders from transferring, withdrawing, or otherwise disposing of the Funds held in the Accounts pending the resolution of the underlying adversary proceeding.  The underlying adversary proceeding seeks to restore all Funds into the Debtor's 401(k) profit sharing plan that is being administered for the benefit of the Debtor's employees post-petition.  Each of the Insiders rolled over their respective Account balances in the Synergy Brands Inc. 401(k) Profit Sharing Plan (the "Plan") to an unrelated financial entity of their choice.  The rollovers took place post-petition without the prior authorization of the bankruptcy Trustee who, upon the filing of the Debtor's bankruptcy petition, became obligated to perform the duties of the plan administrator of the Plan in accordance with 11 U.S.C. §704(a)(11).  The Trustee is seeking to restore the Insiders' Funds back into the Plan so that the remaining Plan participants, as well as the Executives of the Debtor, share equally in the costs of terminating the Plan in bankruptcy. The Trustee is seeking a TRO and a preliminary injunction so as to prevent the Insiders from transferring, withdrawing, or otherwise disposing of the Funds, which would render the

underlying adversary proceeding moot and result in irreparable harm to the remaining Plan participants.

There is an ongoing investigation by the U.S. Attorneys' Office, which was triggered when the United States Department of Homeland Security became aware of systematic transfers of substantial amounts of funds, (reported by the Debtor's criminal defense counsel to be as much as One Billion ($1,000,000,000.00) Dollars) between several of the Debtor's corporate subsidiaries within the United States and corporate entities internationally. The transfers were allegedly made in an effort to make a false showing of commerce, thereby artificially inflating sales figures or other business activity that never occurred. The Insiders have the knowledge, ability, and contacts to easily transfer the Funds out of the country. Thus, the TRO and preliminary injunction are necessary to ensure that, upon receipt of notice by the Insiders' that the Trustee is seeking to have their funds restored back into the Debtor's Plan, the Insiders will not transfer such funds outside the reach of this Court to avoid their pro rata assessment of costs and expenses relating to the termination of the Plan by the Trustee.

<u>**RELEVANT FACTS**</u>

On January 28, 2011, Synergy Brands, Inc. (the "Debtor") filed a voluntary petition (the "Petition") for relief pursuant to Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). At the time of filing, the Debtor was a publicly traded holding company that principally operated through wholly owned subsidiaries. On February 8, 2011, Kenneth Kirschenbaum was appointed Chapter 7 successor trustee (the "Trustee") for the Debtor's bankruptcy estate (the "Estate"). After an initial investigation by the Trustee, he discovered that the Debtor had an employer sponsored 401(k) plan for the benefit of its employees. Pursuant to Section 704(a)(11) of the Bankruptcy Code, the Trustee has a duty to perform the duties of the

plan administrator of the Plan.  As such, the Trustee is actively in the process of terminating the

Plan for the benefit of the Plan participants.  To this end, there is, and will continue to be, costs

and expenses associated with the termination of the Plan that should be shared by all Plan

participants on a pro rata basis.

Each one of the Insiders is a former officer of the Debtor that had money invested in the

Plan on the Petition date.  Subsequent to the filing of the Petition, each Insider rolled over the

Funds on deposit in his individual Plan account to the Accounts established with the Banks.  On

January 31, 2011, Mitchell Gerstein ("Gerstein"), the Debtor's former Chief Financial Officer

and plan administrator of the Plan pre-petition, requested and obtained a distribution of all funds

in his Plan account in the amount of $86,460.91.  Upon information and belief, Gerstein rolled

over his Plan funds to an account with JP Morgan Chase Bank, N.A.  On February 1, 2011,

Thomas Barbella ("Barbella"), a former Executive Vice President of the Debtor, requested and

obtained a distribution of all funds in his Plan account in the amount of $99,420.35.  Upon

information and belief, Barbella rolled over his Plan funds to an account with Charles Schwab.

On February 1, 2011, David Sharin ("Sharin"), a former Executive Vice President of the Debtor,

requested and obtained a distribution of all funds in his Plan account in the amount of

$128,415.44.  Upon information and belief, Sharin rolled over his Plan funds to an account with

Vanguard Fiduciary Trust Company.  On February 9, 2011, Mair Faibish ("Faibish"), the

Debtor's former Chief Executive Officer, requested and obtained a distribution of all funds in his

Plan account in the amount of $82,080.66.  Upon information and belief, Faibish rolled over his

Plan funds to an account with Janney Montgomery Scott LLC.

In total, the Insiders received distributions from the Plan in the aggregate sum of

$396,377.36 post-petition (the "Post-Petition Distributions").  As of December 2010, one month

prior to the filing of the Debtor's Petition, the Plan had an aggregate portfolio value (the "Trust Fund") of $744,888.80. As of March 14, 2011, the total value of the Trust Fund remaining in the Plan portfolio aggregated to $247,902.49.

According to Section 2.4 of the Trust Agreement of the Plan, the Plan Trustee shall pay benefits, fees, and/or dividends paid on Employer Securities, if any, from the Trust Fund only upon receipt of written direction from the Plan Administrator or its designee. The bankruptcy Trustee, in performing the duties of the plan administrator pursuant to Section 704(a)(11) of the Bankruptcy Code never authorized the Plan Trustee to make such distributions to any of the Defendants. According to Section 6.2 of the Trust Agreement of the Plan, all fees and expenses incurred in the administration of the Trust Fund shall be paid from the assets of the Trust Fund, unless paid by the Employer. Here, the Trustee expects to incur reasonable and necessary fees in connection with the termination of the Plan, which fees may be assessed against and paid by the Trust Fund. As such, the Trustee is seeking the equitable treatment of all Plan participants in connection with the pro rata assessment of expenses associated with the termination of the Plan by requiring the Insiders to restore their Post-Petition Distributions back into the Plan. In order to obtain that relief, the Trustee commenced an adversary proceeding against the Defendants.

Upon information and belief, at some time prior to the Petition date, the Debtor was the target of an investigation by the federal government. The investigation, which is ongoing, was triggered when the United States Department of Homeland Security became aware of a systematic transfer of substantial amounts of funds, (reported by the Debtor's criminal defense counsel to be as much as One Billion ($1,000,000,000.00) Dollars) between several of the Debtor's corporate subsidiaries within the United States and corporate entities internationally, allegedly in an effort to make a false showing of commerce and artificially inflate sales figures or

other business activity that never occurred. After allegations of fraud by several of the Insiders surfaced, the Board of Directors fired Gerstein and Faibish, and appointed their replacements pending the filing of the Petition. In short, the Insiders have the knowledge, ability, and contacts to easily transfer the Funds out of the country.

The Trustee contends that the adversary proceeding is an action to recover specific property, the transferred pension funds. A money judgment against the Defendants would not provide adequate relief. Here, the Plaintiff seeks to recover the res. As such, the Trustee requests a temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. 65 in order to restrain the Defendants' Accounts to the extent they hold the Post-Petition Distributions pending the resolution of the underlying adversary proceeding.

## ARGUMENT

### I.    A TEMORARY RESTRAINING ORDER IS WARRANTED SO AS TO PREVENT IRREPARABLE HARM

Pursuant to Fed. R. Civ. P. 65(b), made applicable to these proceedings by Fed. R. Bankr. P. 7065, the Court may issue a TRO without written or oral notice to the adverse party if it appears that "immediate and irreparable injury, loss, or damage will result to the Movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b). Here, the Trustee intends to terminate the Plan in the most expeditious and cost-effective manner possible. To that end, the Trustee has incurred, and will continue to incur, reasonable costs and expenses related to the administration of the Plan. As such, until the Court has an opportunity to determine the underlying merits of this adversary proceeding, there is nothing to prevent the Insiders from withdrawing, transferring, or otherwise disposing of all funds on deposit in the Accounts. In such event, the Insiders are free to spend the funds, or transfer them to an off-shore account that is beyond the reach of this Court's subpoena powers. If this temporary restraining order is

denied, the Trustee, as well as the other Plan participants will suffer an immediate and

irreparable injury, loss, or damage to the extent that the remaining Plan participants, who are

essentially the lower-level former employees of the Debtor, will be required to pay all the costs

and expenses incurred in connection with the termination of the Plan.  Thus, the Trustee

respectfully requests that this Court issue a temporary restraining order preventing any

disbursements, loans, withdrawals, or any other transfer from the Insiders' accounts holding their

Post-Petition Distributions.

## II.    THE TRUSTEE  HAS MET THE NECESSARY STANDARD TO OBTAIN A PRELIMINARY INJUNCTION

To obtain a preliminary injunction in the Second Circuit, the Movant must show that he

will suffer "irreparable harm" absent the injunctive relief and either "(1) that he is likely to

succeed on the merits of his claim; or (2) that there are sufficiently serious questions going to the

merits to make them fair ground for litigation, and that the balance of hardships tips decidedly in

favor of the moving party."  *Lin v. Great Rose Fashion, Inc.*, 2009 U.S. Dist. LEXIS 46726, at

*49-50 (E.D.N.Y.) (citation omitted).

### A.    THE PLAN PARTICIPANTS WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS DENIED

According to the Second Circuit, in order to satisfy the irreparable harm requirement, the

movant must "demonstrate that absent a preliminary injunction [he] will suffer 'an injury that is

neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a

court waits until the end of trial to resolve the harm.'"  *Freedom Holdings v. Spitzer,* 408 F.3d

112, 114 (2d Cir.2005) (quoting *Rodriguez v. DeBuono,* 175 F.3d 227, 234-35 (2d Cir.1999)).

Here, there is a clear cut irreparable harm that will be borne by the remaining former employees

of the Debtor, those who were not "insiders" who would have known of the bankruptcy filing,

who will be forced to pay all the costs to terminate the Plan. Such an outcome would be inequitable and constitutes irreparable harm to the extent that the newly unemployed Plan participants will be required to pay all of the costs and expenses related to the termination of the Plan from their retirement plan funds, while at the same time allowing the Insiders to walk away without paying their pro rata share, which in this case would be approximately 62% of the total costs and expenses. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 596 (3d Cir. 2002) (finding that movant's possible loss of market share based on Defendant's conduct constitutes irreparable harm).

There is also a pending federal investigation relating to the financial activities of the Debtor and its subsidiaries, concerning both domestic and international transactions. The Trustee is concerned that these Insiders will attempt to transfer the Post-Petition Distributions from the Accounts to entities outside the jurisdiction of this Court once they receive notice that the Trustee is attempting to require them to restore their Post-Petition Distributions. If injunctive relief is not granted, the remaining Plan participants would be forced to bear all the costs of the Plan termination themselves while the Insiders contribute nothing. Therefore, the injunctive relief requested, maintaining the status quo, should be granted. *See generally USACO Coal v. Carbomin Energy Co. Inc.*, 689 F.2d 94 (6th Cir. 1982) (granting preliminary injunction freezing defendants' assets in order to protect plaintiff's rights to restitution of funds received by defendants in violation of fiduciary duty, especially when possibility of asset transfer abroad).

### B.    THE TRUSTEE HAS A LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS CLAIM

The decision of whether to grant a preliminary injunction depends on the interplay between the likelihood of irreparable harm to the Movant and the likelihood that the Movant will succeed on the merits at a final hearing. *See Packard Instrument Co. v. ANS, Inc.*, 416 F.2d 943,

945 (2d Cir. 1969). In the underlying complaint, which is annexed to the instant motion, the Trustee is seeking to restore the Post-Petition Distributions to the Trust Fund of the Plan. The Trustee is doing this in order for the Insiders to be required to pay their pro rata share of the costs and expenses incurred in connection with the termination of the Plan. While Gerstein was the pre-petition plan administrator, pursuant to 11 U.S.C. § 704(a)(11) the Trustee has the duty to continue to perform the obligations of the plan administrator post-petition. As laid out in the Complaint, the Trust Agreement of the Plan provides that any distribution from the Plan requires the written authorization of the plan administrator or its designee. *See* Exhibit "A" at Trust Agreement, Section 2.4, ¶ 1. Subsequent to the filing of the Petition, no distributions were authorized by the Trustee, nor did the Trustee name a designee who could authorize distributions.

Here, the Trustee is confident that he will succeed on the merits of the underlying claim because he has an obligation to perform the duties of the plan administrator post-petition pursuant to 11 U.S.C. § 704(a)(11) and such an assessment of pro rata costs and expenses is a reasonable and necessary element in the termination of the Plan. Such a pro rata assessment of costs and expenses against all Plan participants is not only reasonable, but is also within the Trustee's discretion in performing the duties of the plan administrator. Moreover, any hardship borne by the Insiders would be minimal as they would merely be enjoined from making any distributions from the Accounts holding their Funds over a short period of time. Thus, because there is a likelihood of success on the merits on the Trustee's underlying claim, the Court should issue a TRO, temporarily restraining the Banks and the Insiders from making any distributions from the Accounts pending the disposition of the underlying adversary proceeding.

## C.    BALANCE OF HARDSHIPS FAVORS INJUNCTIVE RELIEF

Balancing the hardships plainly favors the institution of the injunctive relief sought so that the Court has an opportunity to hear and determine the underlying merits of the Trustee's adversary proceeding.  If such relief is not granted, the Insiders, upon notice that the Trustee intends to require an assessment of costs and expenses associated with the termination of the Plan, may further transfer and/or sequester the Plan funds outside the reach of this Court.  If that happens, there would be no alternative other than to require the remaining Plan participants to pay all of the costs of Plan termination, while the Insiders, who took their money out just days after the filing of the Petition, would contribute nothing.

On the other hand, if such injunctive relief is granted pending the outcome of the underlying adversary proceeding, the Insiders would only suffer a de minimis hardship, if any hardship at all.  The *res* at issue in this adversary proceeding are the retirement funds.  As such, they must be preserved pending a hearing and determination of the underlying adversary proceeding.  By definition, such funds are not liquid assets that are routinely transferred from one retirement fund to another.  In addition, the injunctive relief sought is not in any other way modifying the Insiders' ability to put money into their current retirement plans, nor is it modifying the manner in which the Banks holding the Post-Petition Distributions should invest such funds.  Consequently, a balance of the hardships tips decidedly in favor of the Trustee in granting the injunctive relief sought in order to preserve the status quo.  *See Garcia v. Yonkers School Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (citation omitted) ("The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.").

## CONCLUSION

Based upon the foregoing, the Court should grant the Trustee's motion for a temporary restraining order and preliminary injunction and grant such other relief as the Court deems just and proper.

Dated: Garden City, New York
      April 20, 2011

                                           Steven B. Sheinwald